MILLER and others, Trustees, Appellants, vs. DOUGLASS and others, Respondents. [Two appeals.]

*March 7—April 5, 1927.*

*Trusts: Construction: Technical meaning of "accretion:" Perpetuities: Conflict of laws: What law applicable: Vesting of interest: Of enjoyment: Interest defeasible by death of beneficiary: Date from which future interests are measured.*

1. An ambiguity in the language used in a trust deed with respect to the share of one beneficiary requires the court to ascertain the true intent of the donor as expressed in the trust deed; and the court is not confined to the language of the specific provision, but may consider any other or all provisions of the instrument, together with surrounding circumstances. p. 492.

2. An accretion, as applied to the share of a donee under a deed of trust, in the broadest sense includes any addition resulting from the death of the donor or the death of other donees; but in its technical sense it is confined to an addition to an original share resulting from the death of a co-beneficiary. p. 492.

3. A deed of trust reserved part of the income of their property to the donors for life, and gave the balance to their children equally, the trust to terminate on the death of both donors, and the principal to be equally divided among their children, the interest of a child predeceasing the donors to go to his children, or, if no children survive, to be divided among the surviving donees, and gave each of the donees the right to dispose of, by will, one half of his share of the income and principal, and any accretions. *Held,* that the word "share" includes both present and future interests which a donee would be entitled to enjoy if he survived the donors; and a child dying before the termination of the trust without issue could bequeath one half of such a "share," the other half going to the surviving donees, the word "accretion" being used as meaning additions resulting from the death of a co-beneficiary. pp. 496-498.

4. Whether an instrument violates the law against perpetuities as to real estate must be determined by the law of the state in which the real estate is situated. p. 499.

5. Sec. 178 of the Real Property Law of New York, providing that the period during which the absolute right of alienation may be suspended, by an instrument in execution of a power, must be computed from the time of the creation of the power, and sec. 179, providing that no estate or interest can be given or limited in execution of a power unless it would have been valid if given or limited at the time of the creation of the power, are merely declaratory of the common law. p. 499.

6. Although the New York courts have held that under said Real Property Law the law of perpetuities in New York does not merely involve the subject of the unlawful restraint of the power of alienation, but also that of remoteness of vesting, which includes vesting in possession and enjoyment as well as vesting in interest, this court does not follow the rule. p. 506.

7. Under the trust deed the children of the donors are *held* to have taken a vested interest from the creation of the trust,— vested in enjoyment as to part of the income and vested in interest as to the balance of the income and a share of the principal; and the power of testamentary disposition being general, the future interests created were measured from the date of the exercise of the power and not from the date of its creation, as respects the rules against perpetuities, including the Real Property Law of New York. p. 503.

8. Whether future interests, created under a general testamentary power, are measured from the date of the exercise of the power or from the date of its creation, depends upon the

facts of the particular case as respects a violation of the rule against perpetuities.  p. 505.

9. The law of the situs of personal property governs as respects the question of perpetuities; and prior to ch. 287 of the Laws of 1925, amending. sec. 2038, Stats. 1923 (now sec. 230.14), no law of perpetuities existed in Wisconsin as to personal property.  p. 506.

APPEALS from a judgment of the circuit court for Milwaukee county: GUSTAVE G. GEHRZ, Circuit Judge.  *Affirmed.*

One of the appeals was taken by the guardian *ad litem* of the minors other than *Fern Douglass,* and the other by the plaintiffs herein.

On December 5, 1910, George Douglass and his wife, Susan Dun Douglass, residents of Milwaukee, Wisconsin, being the owners of certain real estate situated in the states of New York, Rhode Island, and Colorado of the approximate value of $200,000, and of personal property of the value of about $1,500,000, executed and delivered to certain named trustees and their successors a trust deed.  When the trust was created the donors had four children living, one of whom was George A. Douglass, who died February 23, 1918, leaving him surviving his widow, Julia, whom he married in 1916, and who died in 1924, and *Fern Douglass,* a stepchild of said George A. Douglass, born in 1913. George Douglass, one of the donors of the trust, died in 1919.

The trust deed provided for the investment and reinvestment of the trust funds in either personal or real property by the trustees, and they were also authorized to convert real property into personal, and personal property into real. It was also directed that the trust continue until the death of both of the donors; and that upon the happening of that event the same should terminate and the trust estate be distributed.

The action herein having been brought for the purpose of

obtaining a construction of the trust deed, we now here set forth the provisions involved, the vital provision requiring construction being printed in italics:

"The net income arising from said trust estate shall be paid over annually, or at other convenient periods, by said trustees, as follows: They shall pay to said George Douglass, as long as his said wife and he shall live, seventy-five (75) per cent. of the net income, and twenty-five (25) per cent. to his children, Elizabeth Douglass Clay, wife of Samuel Clay, Virginia Douglass Weller, widow of Harry B. Weller, deceased, George A. Douglass, and Anne D. Dillon, wife of Clarence L. Dillon, share and share alike, and upon the death of either himself or his said wife, shall pay fifty (50) per cent. of the net income to the survivor so long as such survivor shall live, and the remaining fifty (50) per cent. of the net income to his said children, share and share alike; but the payment of at least twenty-five thousand dollars ($25,000) per annum to said George Douglass, as long as he shall live, and to his said wife, should she survive him, as long as she shall live, is hereby declared to be a first lien or claim upon the entire income of said trust.

"If in any case any of his said children shall die before the expiration of this trust, the children or children's children of any such said child shall take the same interest as their parent would have taken, if living, in equal shares *per stirpes*. If any of his said children should die without leaving children, then the share of such child in the income and corpus shall form a part of the trust estate, the income to be divided annually among the other beneficiaries *per stirpes*. *Each of his aforesaid children shall have the right to dispose of, by his or her last will and testament, one half (½) of his or her share of said income and any accretions thereof up to his or her death, and one half (½) of the principal of his or her share of said trust fund and any accretions thereof up to his or her death.* In that case the interest so disposed of shall vest in the person so named in said last will and testament and in his or her heirs, executors, administrators, or assigns, but the corpus shall remain in trust hereunder until the termination of this trust.

"Upon the termination of this trust the entire principal of the trust fund shall be divided and distributed among the

aforesaid four children of the aforesaid George Douglass and Susan Dun Douglass, his wife, share and share alike, the children and children's children of any child taking the same share their parent would have taken if living. The share of any child who has died without leaving children shall be added to the shares of the surviving children, *per stirpes,* except as to the one half (½) of any such share as may have been disposed of as hereinbefore provided."

George A. Douglass executed a last will and testament for the benefit of his wife and his stepdaughter, *Fern.* Under this will the trustees under the trust deed were directed until the end of the trust term to pay one half of the income from his share for the support of his wife and stepdaughter. On the termination of the trust he further directed the payment of his share to certain trustees for the benefit of his wife and stepchild, during their lives.

For the plaintiffs and appellants there was a brief by *Miller, Mack & Fairchild,* and oral argument by *Bert Vandervelde,* all of Milwaukee.

For the minor appellants, *Douglas Dillon, Dorothy Dillon,* and *Susan Clay,* there was a brief by *Louis Quarles,* guardian *ad litem,* and oral argument by *Howard A. Hartman,* both of Milwaukee.

For the respondent *Northern Trust Company,* administrator, and *Fern Douglass,* a minor respondent, there was a brief by *Fawsett, Smart & Shea* of Milwaukee and *Scott, Bancroft, Martin & MacLeish* of Chicago, attorneys, and *Charles F. Fawsett* of Milwaukee, guardian *ad litem;* and the cause was argued orally by *Mr. Fawsett.*

DOERFLER, J. Counsel for plaintiffs, and the guardian *ad litem* of the minors other than *Fern,* argue that when a child makes a testamentary disposition with respect to one half of his share, both as to the income and the corpus, the amount of the income that passes consists of that actually received at the time of the death of the child, such amount

so fixed to continue thereafter to the end of the period of the trust estate, without any additions thereto coming either by reason of the death of one of the donors or of the death of other children of the donors; also that the amount of the corpus that passes under the will consists of one half of a child's share, plus all additions to such share which have resulted from the death of another child or children prior to the time of the death of the testator.

On the other hand, respondents' counsel take the position that if a child should die before the termination of the trust he could lawfully by will dispose of one half of his share of the income which he would have been entitled to receive under the trust deed if he or she had continued to live until the termination of the trust, and one half of the share of the corpus which such child would have been entitled to receive on the termination of the trust if he or she had continued to live until that time, without, however, any addition to the amount of either income or principal which any such child is authorized to so dispose of by will by reason of the subsequent death of any other child named in said trust deed.

When George A. Douglass died in 1918, both of the donors of trust and the remaining children were alive. Up to that time, therefore, none of the incidents had transpired which under the provisions of the trust deed would have resulted in an addition to George A. Douglass's share. The year following, however, viz. 1919, George Douglass, one of the donors, died, and while prior to the death of the son, George A. Douglass, the children had distributed to them one quarter of the net income, if the latter had lived until after the death of his father there would have been distributed among the children one half of the net income of the trust estate. The only question involved in this branch of the case consists of whether, under the facts in the case, George A. Douglass by his will had the right to dispose of one quarter of fifty per cent. of the net income of the trust

estate from the time of his father's death, or one quarter of twenty-five per cent. of such net income. An ambiguity in the language used in the trust deed with respect to the share of the net income which George A. Douglass, the son, had a right to make disposition of, requires the court in the first instance to ascertain, if possible, the true intent of the donors of the trust as expressed in the trust deed; and in arriving at such intention we are not confined solely to the language of the specific provision contained in the trust deed under and pursuant to which a child may dispose of one half of his share by a last will and testament, but may consider any and all other provisions of the instrument, together with the surrounding facts and circumstances.

As we view the matter, the solution of the questions involved is centered upon the meaning of the terms "share" and "accretion." An accretion in its broadest sense would include any addition, whether the same results by reason of the death of one of the donors or by the death of any of the other children. In its technical sense, however, the meaning of the word "accretion" is confined to an addition to the original share resulting from the death of a child. Webster's New International Dictionary defines the word "accretion," among other things, as follows: "Gain to an heir or legatee by failure of a co-heir to the same succession or a co-legatee of the same thing to take his share." This has also been held to be the technical definition of the word "accretion" in the following cases, cited in brief of counsel for the respondent and of the guardian *ad litem* of *Fern Douglass: Emeric v. Alvarado,* 64 Cal. 529, 2 Pac. 418, 440; *Succession of Hunter,* 45 La. Ann. 262, 12 South. 312; *Farrar v. McCutcheon,* 4 Mart. (La.) N. S. 45. See, also, 2 Bl. Comm. (Hammond's ed.) p. 302.

A reading of the trust deed is persuasive that it was drawn by an able and experienced lawyer. The instrument is broad and comprehensive. It defines in apt language the rights of

both the donors and the beneficiaries under the trust, and also in detail defines the duties of the trustees. It is a model in composition, and the use of legal terms is accurate and specific. In his experience the writer has met with no instrument of a similar nature which more comprehensively and yet tersely, in legal phraseology, covers all of the varied interests and obligations which must be dealt with in the preparation and execution of a trust deed. The preparation of a trust deed lies primarily within the field of the legal profession, and it would be dangerous indeed for any one but a lawyer to attempt to draft such an instrument, by reason of the complicated situations, involving both fact and law. Trust deeds ordinarily deal with the subject of trusts, which constitutes one of the most difficult and complicated branches of the law. The drafting of a trust deed like the one in question also embraces a knowledge of the statutes and of the common law on perpetuities, and we think it is most generally conceded that cases arising upon this subject are among the most difficult of solution. From this we are led to the irresistible inference that when the time arrived for the execution of this trust the donors realized that it was necessary to engage the services of a member of the legal profession who would best in their opinion be able to outline and fix the terms of the trust in such a manner as would effectively express their intentions in proper legal form. Under these circumstances it can hardly be said that the word "accretion" was used in any other sense than in the strictly legal, technical sense, and if it had been the intention either of the donors, acting under legal advice, or of the scrivener, to use the word in accordance with its common and popular acceptation, language denoting such intention would have been used, and such meaning made plain.

The donors of this trust became the owners of an estate consisting of real and personal property of the value of ap-

proximately $1,700,000.  They were both advanced in years, and realized that if ample provision were reserved for them during the balance of their lives out of the net income of the trust, their individual requirements would be fully satisfied. Accordingly they reserved unto themselves, during the period while both were alive, seventy-five per cent. of the net income.  They had four children, three girls and one boy, all of whom were of marriageable age.  Having reserved to themselves out of the net income an adequate competency, their next thought centered upon making a provision for their children, and they concluded to provide for them twenty-five per cent. of the net income while both the donors should remain alive.  This percentage of the income was to be divided equally among the children.  Owing to their advanced ages, it became evident to them that in the natural course of events one of them might die before any of their children, and that in such event fifty per cent. of the net income would constitute an adequate sufficiency to take care of the survivor during the balance of his or her period of life.  Under these circumstances they deemed it fit and proper to decrease the amount reserved to the survivor to fifty per cent. of the net income, and devoted an additional twenty-five per cent. for the benefit of their children.

The provisions of the trust deed as embraced in these recitals constitute the original and basic plan for the disposition of the trust estate under the trust deed; and no speculative logic need be resorted to in order to assume that it was the fondest hope of the donors of the trust that the children would all live until the end of the period, so that they might all enjoy not only the income allotted to them but also the corpus.

What meaning, then, did the donors intend to convey in that portion of the instrument where they provide for a disposition of one half of a share by last will and testament?

What did they mean by the term "share" as it pertained to income? Clearly they had in mind the share of the income of a child up to the time of the death of both of the donors, which would terminate the trust.

But in addition to the foregoing they had a further vision. They knew that life was uncertain, both in old age and in youth; that a child might die before the termination of the trust leaving issue, or that a child might die without issue, and so they evolved a secondary plan, under which the issue of the deceased child might take the share which its parent would otherwise take; also that if the child died without issue, in that event the share of such child would go to the surviving children unless disposition of one half of the share of the child were made by the execution of a will. So that they looked beyond the objects of their bounty as determined by blood ties, and extended a right to dispose of one half of the child's share in a last will and testament. Evidently their thought was that if a child were unhappily married, the entire share would go back to the surviving children, or if the marriage were a happy one, provision could be made for the benefit of a spouse. These mental operations appear from the face of the instrument as plainly, to a careful reader, as though they were incorporated therein in express language.

The express language of the deed before the court for construction is as follows:

"Each of his aforesaid children shall have the right to dispose of, by his or her last will and testament, one half ($\frac{1}{2}$) of his or her share of said income and any accretions thereof up to his or her death, and one half ($\frac{1}{2}$) of the principal of his or her share of said trust fund and any accretions thereof up to his or her death."

The theoretical division into a basic plan and a secondary plan is made merely for illustrative purposes, in order to elucidate the meaning of the word "share" in that portion of

the trust deed immediately above quoted. Considering, therefore, the so-called basic plan, what would have been the share of a child if all of the children had survived the donors? Clearly it would have included one fourth of twenty-five per cent. of the net income up to the time of the death of one of the donors, and one fourth of fifty per cent. thereof thereafter, until the death of the surviving donor, which later event would have brought the trust to a termination. The provision for an increase in the income of a child by reason of the death of a donor constitutes part of the fundamental plan of the donors, designed for the benefit of the children, and fixes definitely what the donors had in mind by the use of the word "share" with respect to the income. When we come, then, to a consideration of both the primary and the secondary plans, no different result can be logically arrived at. A child's share may be increased both as to income and principal by the death of the brother or of a sister. Upon the happening of such event the share of the children surviving would consist of not only their share coming to them under the primary plan, but an addition thereto, which in its technical sense, as above shown, is known as an accretion. During the continuation of the trust the share of a child would consist of a present and a future interest. The present interest would consist of that part of the income which, when received, he would be in a position actually to enjoy. The balance, and by far the greater and more valuable portion, constituted a future interest, which he might enjoy if he continued to live. When the trust deed was executed and delivered the donors parted with every interest they owned in the trust estate, barring only a reservation for their benefit of a portion of the income. The logical deduction from the foregoing, therefore, follows, that the word "share" as used in that part of the deed under consideration includes both the present and future interests which a child would be entitled to enjoy if it survived the

donors.   This meaning of the word "share" is further clari-
fied by the provision in the deed which reads as follows:

"Upon the termination of this trust the entire principal
of the trust fund shall be divided and distributed among the
aforesaid four children of the aforesaid George Douglass
and Susan Dun Douglass, his wife, share and share alike,
the children and children's children of any child taking the
same share their parent would have taken if living.   The
share of any child who has died without leaving children
shall be added to the shares of the surviving children, *per
stirpes,* except as to the one half ($\frac{1}{2}$) of any such share as
may have been disposed of as hereinbefore provided."

If a child, therefore, dies without having made a dispo-
sition by last will and testament of one half of his share
as provided for by the trust deed, his children and children's
children will take the same share their parent would have
taken if living.   This can have but one meaning, viz.: the
share which a child dying before the end of the trust would
have taken if it had lived until the end of the trust period.
But if this particular child sees fit to make a will with respect
to one half of his share, the surviving issue will only take
one half of the child's share, the other one half going to the
person or persons designated in the will.   In other words,
where a will is made, the share of a child is divided into two
parts.   One half thereof goes, under the trust deed, to the
issue, and the other to the beneficiaries under the will.   This
disposes of the entire share.   The share passing under the will
is one half of the whole share, while the share going to the
issue constitutes the other one half.   There is absolutely no
distinction between these two halves.   If, however, a child
dies without leaving children, such share is added to the
share of the surviving children, *per stirpes,* subject, how-
ever, to the right of the child to dispose of one half of such
share by last will and testament.   Here, then, the same
situation is presented with respect to the meaning of the
word "share" as appears in the provision of the deed in

regard to a child leaving issue. In either case, one half of the child's share may be disposed of by will. If the share of the child dying without will passes into the trust estate for the benefit of the surviving children, the share so passing consists of what the child dying would have been entitled to if he or she had lived up to the time of the death of the donors; and the one half of the share which is subject to testamentary disposition is a component part of the entire share.

Further comment might be indulged in with respect to the meaning of the word "share" as it is used in that portion of the trust deed which extends the right to a child to dispose of one half of his share by will, but we deem it unnecessary. We are convinced that the accretions referred to by way of limitation to one half of the share of the income and principal are the additions which come to a child by reason of the death of another child; that such term is used in its technical sense; and that it was not used in its broad and popular sense.

In passing, it is further to be noted that the word "share" as used in that portion of the deed authorizing a testamentary disposition clearly contemplates that portion of the trust estate, both income and principal, which would come to a child upon the death of the donors, on the theory that all the children are alive at such time; that it is used in contradistinction to a share which would include accretions. The deed then continues and says: "and any accretions thereof up to his or her death." While the primary share would include one fourth of both twenty-five per cent. and fifty per cent. of the income, the term "accretions" can only refer to such additions as come to a child by reason of the death of another child.

The guardian *ad litem* of the minors excepting *Fern Douglass* further contends that the exercise of the power by George A. Douglass in the making of his will violates the rule against perpetuities as in force in the state of Wisconsin, the situs of the personal property, and in the states of

New York, Rhode Island, and Colorado, where the real estate is situated; and that therefore the interest of George A. Douglass under the trust deed pursuant to its terms passed to his sisters and their children; that the trust was based upon two lives, viz. George Douglass and Susan Dun Douglass, the donors; that under the will of George A. Douglass he further confines the interest which he is authorized to dispose of by will to his wife, Julia Douglass, and his stepchild, *Fern;* that the interest of George A. Douglass disposed of by will is fettered by the lives of three persons in being and one not *in esse* at the time of the execution of the trust deed.

In *Ford v. Ford,* 70 Wis. 19, 33 N. W. 188, it was held that whether or not an instrument violates the law on perpetuities as to real estate must be determined by the law of the state in which the real estate is situated. 4 Birdseye, Cumming & Gilbert's Consolidated Laws of New York, p. 5028, among other things provides:

Sec. 178. "The period during which the absolute power of alienation may be suspended, by an instrument in execution of a power, must be computed, not from the date of such instrument, but from the time of the creation of the power."

Sec. 179. "An estate or interest cannot be given or limited to any person, by an instrument in execution of a power, unless it would have been valid, if given or limited at the time of the creation of the power."

These statutes are merely declaratory of the common law, as will appear from the following decisions, cited in the brief of the guardian *ad litem* for the minors other than *Fern Douglass: In re Bankers Trust Co.* 82 Misc. 375, 143 N. Y. Supp. 843; *Farmers' Loan & T. Co. v. Kip,* 120 App. Div. 347, 104 N. Y. Supp. 1092; *Fargo v. Squiers,* 154 N. Y. 250, 48 N. E. 509; *Reed v. McIlvein,* 113 Md. 140, 77 Atl. 329; *Estate of Lawrence,* 136 Pa. St. 354, 20 Atl. 521, 11 L. R. A. 85; Gray, Perpetuities, § 526; Lewis, Perpetuities, 488; and *Hawley v. James,* 16 Wend. (N. Y.) 61,

Sec. 42, Real Property Law of New York (4 Birdseye, Cumming & Gilbert's Consolidated Laws of New York), provides (p. 4940):

"The absolute power of alienation is suspended when there are no persons in being by whom an absolute fee in possession can be conveyed. Every future estate shall be void in its creation, which shall suspend the absolute power of alienation by any limitation or condition whatsoever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate; except that a contingent remainder in fee may be created on a prior remainder in fee, to take effect in the event that the persons to whom the first remainder is limited, die under the age of twenty-one years, or on any other contingency by which the estate of such persons may be determined before they attain full age. For the purpose of this section, a minority is deemed a part of a life, and not an absolute term equal to the possible duration of such minority."

The guardian *ad litem* insists that both under the common-law rule in force in Rhode Island and in Colorado, and under the statutes of New York, the law on perpetuities is not merely confined to the subject of unlawful suspension of the power of alienation, but that it is also aimed at remoteness in vesting; that the rule with respect to remoteness of vesting existed in the common law of England prior to that of the unlawful suspension of the power of alienation. We are now considering merely the law on perpetuities with respect to real estate and not to personal property.

In *Becker v. Chester,* 115 Wis. 90, 91 N. W. 87, 650, which decision was rendered in 1902, the statutes and decisions of New York upon the subject of perpetuities were carefully and thoroughly considered, and it was there held that both under the laws of New York and the laws of the state of Wisconsin the original rule of the common law pertaining to remoteness of vesting was not involved, and that the only question which could be considered was whether or not there was an unlawful restraint upon the power of

alienation.   In the *Becker Case* it is in substance said that
the object of the law is to prevent property from being with-
held from the market for the purposes of sale; that an illegal
restraint keeps property from the market and therefore in-
terferes with the sale or exchange of real estate; and that
such restraint has a tendency to affect real-estate values.   If
we were satisfied that the Wisconsin law were applicable to
the situation, we would be bound by the rule laid down in
the *Becker Case.*   Numerous New York cases are carefully
analyzed in the *Becker Case,* and from a review of such
cases the court was led to the conclusion that the law in New
York and Wisconsin was identical; that it was confined to
the subject of unlawful restraint of the power of alienation.

Since the decision in the *Becker Case* a number of other
decisions have been handed down by the supreme court of
New York, and reference is particularly made in the brief
of the guardian *ad litem* to the case of *Matter of Wilcox,* 194
N. Y. 288, 87 N. E. 497.   While the *Wilcox Case* concerned
itself primarily with the subject of perpetuities as involving
personal property, the decision at some considerable length
goes into the question of perpetuities in real estate, and
numerous prior decisions in that state were digested and re-
viewed, and the court arrived at the conclusion that the
law on perpetuities in New York did not only involve the
subject of the unlawful restraint of the power of alienation,
but also that of remoteness of vesting, and it was held in
that case that the term "vesting" did not apply merely to a
vesting in interest, but also one in possession and enjoyment.

The guardian *ad litem* also in support of his position cites
Chaplin on Suspension of Power of Alienation (1st ed.),
p. 176, note 1; p. 217, § 384; also the same author, in the
second edition, §§ 294 and 354.   It may be also said that in
support of this view the New York court in the *Wilcox
Case* cited with approval the same author.   We will there-
fore consider the question involved from the standpoint of

the New York law as it is construed both by the New York court in the *Wilcox Case* and by the learned author above referred to.

It is conceded by counsel for the respondents that under the statutes and the law a power must be construed as being a part of the original deed, to the same effect as though it were incorporated therein verbatim. Professor Page, in his work on Wills, vol. 2, p. 1817, § 1102, in a chapter written by Professor Rundell, University of Wisconsin, states the general proposition as follows:

"Since the exercise of a power is a condition precedent to the vesting of interests created through its exercise, no valid interest can be created under a power which may be exercised at a time after its creation longer than permitted by the rule."

While this is the general rule, the exception is stated as follows:

"An exception to the foregoing rules exists in the case of general powers, that is powers by virtue of which the donee may appoint to any one, including himself. In the case of such powers, the donee of the power is, for the purposes of the rule, regarded as the owner of the property from the time he is able under the terms of the power to appoint. While the right to make an appointment is regarded as a condition precedent to the vesting of the estates created under the power, the actual exercise of the power is not. Hence a testator can give a general power exercisable at any time during their lives to his unborn grandchildren. Though by its terms such a power may be exercised at a time later than lives in being and twenty-one years after its creation, it will certainly be exercisable within that time. . . . For the purposes of the rule, future interests created under a general power are measured from the date of the exercise of the power rather than from the date of its creation, as in the case of special powers."

In note 14, page 1818, it is said:

"The only doubt upon the rule stated in the text is whether an appointment under a general testamentary power is to be measured from the time of the exercise of such power as

in the case of a general power to appoint by deed or will, or whether it is to be measured from the time of the creation of the power as in the case of a special power. Professor Gray thought that appointments under a general testamentary power should be measured from the time of the creation of the power. Perpetuities (3d ed.) §§ 526–530*d*, 26 H. L. R. 720. He argued that the reason for measuring from the time of the exercise of a general power to appoint by deed or will is that such power is the equivalent of ownership. But in the case of a power to appoint by will only, the donee of such power is never the equivalent of owner. Professor Kales, on the other hand, was of the opinion that the same rule in this respect should apply to general testamentary powers as to other general powers. 26 H. L. R. 6. He argued that at the moment of the exercise of the power the donee could do everything that he could do if he were the owner."

Under the deed each of the children of the donors was given a general power to dispose of, by his or her last will and testament, one half of his or her share of said income, etc., and one half of his or her share of the corpus. The creators of the trust in express language designated the interest which a child could dispose of as one half of his share. When the trust deed was executed the donors parted with their entire title to the property, reserving only unto themselves a portion of the income. Under no circumstances could they be permitted to reclaim any portion of the property conveyed in trust. The deed in that respect was absolute and indefeasible, and it vested in the four children, from the time of the creation of the trust, a vested interest; vested in enjoyment as to a part of the income, and vested in interest as to the balance of both income and principal. *Will of Cramer,* 183 Wis. 516, 198 N. W. 382; *Will of Roth,* 191 Wis. 366, 210 N. W. 826. The fact that these interests were defeasible by the death of a child prior to the termination of the trust, under the conditions of the trust deed, under certain circumstances, did not prevent the respective shares of the children from becoming vested.

The power to dispose of a part of a share of both income and principal is a general power. The children were not hampered or fettered by any provision in the deed with respect to the manner in which they were authorized to dispose of the one-half share which was vested in them. They could either devise or bequeath it to a collateral relative, to a wife or husband, to a child or children, or to a perfect stranger. The matter of disposition was entirely left to them. When disposition is made by a will under this power, under the express language of the trust deed the beneficiaries obtained a vested interest. It is true that a power to dispose of by will differs in one respect from a power to dispose of by deed or bill of sale. Where a general power is executed to dispose of by deed or bill of sale, the person possessing the power is to all intents and purposes the real owner of the property from the standpoint of the power. He can dispose of it to himself, or he can dispose of it to others of his choice. Such a power differs from a general testamentary power only in the respect that the possessor of the power cannot devise or bequeath to himself, because a will takes effect only upon the death of the testator. But under the general testamentary power granted in the instant case, the execution thereof is absolutely unrestrained. In other words, he can accomplish anything under this general testamentary power that it is possible for a testator to accomplish.

When we therefore bear in mind that the donors of the trust denominated the interest of a child as a share, and then created such share as a vested interest, and then authorized an unrestricted testamentary disposition, it is clear that they did everything in their power to create a situation whereby to all intents and purposes it must be deemed that they considered the possessors of the power as the absolute owners of the interest which they were authorized to dispose of. Professor Gray's view, therefore, does not appeal to us as having substantial merit. Under these circumstances we

are of the opinion that the rule as above quoted with respect to general powers applies.

It may be true that a general testamentary power in some cases is not of such a nature that it may be said that in so far as the execution of the power is concerned the possessor of the power is not the equivalent of the actual owner. But in the instant case, in view of all the facts and circumstances above referred to, we are of the opinion that under this general power the future interests created are measured from the date of the exercise of the power, rather than from the date of its creation. Each case must stand or fall upon its own particular facts.

Assuming, therefore, that the law of New York with respect to remoteness of vesting as above indicated applies to the instant case, nevertheless there is no violation thereof in the instant case. A reading of the New York statutes above quoted is rather persuasive that they were directed to the unlawful restraint of the power of alienation, and not to remoteness of vesting. The learned judge of the New York court who wrote the opinion in the *Wilcox Case* concludes that by the enactment of the statutes the common-law rule on perpetuities as to remoteness of vesting was not abolished, but that it still obtains in the state of New York for the reason that it was not expressly abrogated. In fact, in the opinion he refers to the revisers of the New York statutes, of whom he says that they were men of great wisdom and learning and undoubtedly were familiar with the common-law rule on perpetuities, and that unquestionably they had this rule in mind at the time of the revision.

The common-law rule, however, is vitally different from that which is announced in *Matter of Wilcox,* and which is there declared as being still in force in the state of New York. In 21 Ruling Case Law, p. 290, § 12, the common-law rule is stated as follows:

"The rule against perpetuities has reference to the time within which the title vests, and has nothing to do with the

postponement of the enjoyment. (Citing a number of cases in note 14.) A vested interest does not necessarily include a right to the possession, and if an interest is vested it is not subject to the rule, however remote may be the time when it may come into possession. As far as the rule is concerned the mere postponement of the time of payment of a gift is not important. Therefore if the event on which a contingent remainder is limited must happen and the contingent become a vested remainder within the time allowed by the rule against perpetuities, the rule is not violated by the fact that the remainder so vested is not to be enjoyed until some future fixed time or until the dropping out of an existing life estate."

If this common-law rule be applicable to the instant case, there was never a time from the creation of the trust until its termination where the trust estate was not vested; nor was there a time after the termination of the trust estate where the interest of the testator was not vested. So that it would appear to us that the New York court by adopting the common-law rule on perpetuities with respect to remoteness of vesting was apparently in error when it adopted a rule which required vesting in actual possession and enjoyment.

It is not argued by counsel for the guardian *ad litem* that the rule of perpetuities with respect to the unlawful restraint of the power of alienation has been violated in this case. Such a contention, if made, would be utterly futile, for there never was an instant during the continuation of the trust created by the trust deed or the trust created under the will that persons were not in being who could convey an absolute title in possession to the real estate.

As has heretofore been said, the law of Wisconsin, being the situs of the personal property, governs as to it. As early as 1879, when the case of *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103, was decided, it was determined that no law of perpetuities existed in this state as to personal property. The question was again thoroughly considered in the *Becker Case, supra* (115 Wis. 90, 91

N. W. 87, 650), and the holding in the *Dodge Case* was there affirmed; and this continued to be the law in this state until the amendment to sec. 230.14 of the Statutes was passed by ch. 287 of the Laws of 1925.

In its decision the trial court held that inheritance taxes on the interest transferred by the will, and the expense of probating the will, were payable out of the corpus which passed under the will. The correctness of this holding is not challenged by any of the counsel in this case, and it appears to be the law, as is shown by the following cases, cited in the brief of respondents' counsel: *People v. Lowenstein,* 284 Ill. 126, 119 N. E. 917; *Matter of Tracy,* 179 N. Y. 501, 72 N. E. 519; *Title G. & T. Co. v. Lohrke* (N. J.) 102 Atl. 660; *Parkhurst v. Ginn,* 228 Mass. 159, 117 N. E. 202.

The judgment of the lower court is therefore affirmed.

*By the Court.*—It is so ordered.