Welch (William O.) and another, Plaintiffs and Appellants, vs. Welch (Charles G.) and others, Defendants and Respondents: Welch (Annette L.) and others, Interpleaded Defendants and Appellants.

*November 10, 1939—June 24, 1940.*

284

290

For the appellants, other than minor heirs, there were briefs by *Bloodgood, Kemper & Passmore* and *William E. Burke,* all of Milwaukee, and oral argument by *Mr. Eric W. Passmore* and *Mr. Burke.*

*Hubert O. Wolfe* of Milwaukee, guardian *ad litem,* for the appellants, minor heirs.

For the respondents there were briefs by *Miller, Mack & Fairchild* of Milwaukee, and *Harvey J. Frame* of Waukesha, and oral argument by *Mr. Paul R. Newcomb* of Milwaukee and *Mr. Frame.*

*Edgar L. Wood* of Milwaukee, argued orally for the interpleaded defendant Wisconsin Equities, Inc.

The following opinion was filed March 12, 1940:

NELSON, J. This controversy involves numerous disputes between the plaintiffs, certain of the interpleaded defendants and the guardian *ad litem* on the one hand, and the defendants on the other, regarding the management of a trust which was created in 1914. The record, which is unusually voluminous, contains hundreds of exhibits, among which are extensive audits and analyses by the accountants for the respective parties. The findings of fact and conclusions of law required eighty-five pages of the printed case for recitation. The appellants' brief contains twenty-three assignments of error, exclusive of that assigned by Peat, Marwick, Mitchell & Company. A full recitation of the facts will not be attempted. Such a recitation would unduly

prolong the opinion and be of little, if any, value, either to the parties or to the bar of this state.

An orderly treatment of the matters involved in this appeal first requires that a general statement of the facts be made. Particular facts, necessary to an understanding of the asserted errors, will be stated in discussing the contentions of the appellants.

Charles Welch, Sr., was the husband of Margaret F. Welch, the settlor of the trust, and the father of Corinna G. Hengels, Charles G. Welch, William O. Welch, and James B. Welch. For many years he was actively engaged as principal owner in operating the White Rock Mineral Springs Company at Waukesha, where he resided. A short time prior to his death, which occurred on July 25, 1910, he retired from active business and moved to Milwaukee. He left an estate, appraised for inheritance tax purposes, at $1,183,591.36, all of which he bequeathed and devised to his widow, Margaret F. Welch. On several occasions, after retiring from active business, he had talked to the defendant, Estberg, a close friend, who was engaged in the banking business at Waukesha, about leaving his property in trust because of his thought that his children had had so little business experience. He did make such a will but later revoked it and thereafter executed the will admitted to probate. In 1903, he had bought certain real estate located at Seventh street and Wisconsin avenue, in the city of Milwaukee. He owned, besides his homestead, lands in Illinois, Montana, and Washington, and numerous stocks and bonds. He nominated and appointed his wife, Margaret F. Welch, and his son, Charles G. Welch, executors of his will. They were duly appointed and administered his estate. At the conclusion of the administration, Margaret F. Welch received properties appraised at $863,174.82. Thereafter, the properties which she received were managed by her and the

defendant, Charles G. Welch. Some time thereafter she gave to each of her four children the sum of $50,000. On October 28, 1914, she executed a trust deed as party of the first part, to herself, Charles G. Welch and Ed. R. Estberg as parties of the second part. The trust deed first recited: That she was the owner of certain real estate located in the state of Montana, various issues of industrial bonds and numerous shares of stock and other securities, all of which were specifically listed, and that she was desirous of selling, assigning, transferring, and conveying all of the property described, together with all other property owned by her, except her homestead and its appurtenances and the personal property situated thereon, to the parties of the second part, in trust for the uses and purposes thereinafter mentioned and with the powers and authority thereinafter granted.

The trust deed, omitting the recitations hereinbefore referred to, is printed in the margin.[1]

---

[1] "Now, therefore, in consideration of the premises and of one dollar and other valuable considerations, including the acceptance of this trust, the said party of the first part does hereby grant, bargain, sell, remise, release, convey, assign, and confirm unto the said parties of the second part, as joint tenants and not as tenants in common, and to the survivor or survivors of them and to their successors in trust, all of the property above mentioned, both real, personal and mixed and wherever the same may be situated, to have and to hold said property and the whole thereof to themselves, their survivors and successors in trust with the following powers and authorities, to wit:

"1. The said trustee and the survivor or survivors of them and their successors in said trust shall for convenience be collectively designated and known as 'Trustees of Margaret F. Welch.'

"2. Said trustees, their survivors and successors, shall have full power and authority to grant, bargain, sell, convey and otherwise dispose of the whole or any part of said property and to invest and reinvest the proceeds of any sales thereof, and to convert personal property into real property and real property into personal property as they may deem for the best interests of the trust estate, all upon such terms and conditions and for such considerations and with or without security as they shall deem best, and they may also at any time or times, for the purpose of raising money with which to carry out and exercise the powers hereby given them, with refer-

The trustees took over the trust estate and commenced to manage it. At that time the three sons, Charles, William, and James, were interested in three different businesses. Charles was interested in a company known as the Independent Electric Company. After the trust was created, the name of that company was changed to Industrial Controller Company. It was ultimately merged with the Square D

ence to the management of said trust property, mortgage or pledge the whole or any part or parts thereof, upon such terms and conditions and for such length of time and at such rate of interest as they shall deem best, and may also from time to time borrow such sums of money for the purposes of the trust, upon the faith and credit of said trust estate and upon such terms and for such length of time and at such rate of interest as they shall deem best, and may also execute such notes, deeds, bills of sale, mortgages, contracts and other obligations as they shall deem best or suitable for the purpose of exercising any of the powers hereby given to them, but they shall not be personally liable therefor.

"3. Said trustees shall have and they are hereby given full power and authority to engage in any lawful business whatsoever that they may consider advisable and for the interest of the trust estate, nothing herein contained being intended to limit the trustees in respect to their engaging in any such business, but they are to have and are hereby given the right and power to exercise their judgment and discretion as to the investment and employment of any or all of the trust estate that may come into their possession at any time during the continuance of this trust, and they shall also have the power to make and enter into all suitable or expedient contracts for the purposes of carrying on any business or doing anything which they are hereby authorized to do.

"4. Said trustees shall have full power and authority to collect, sue for, receive and receipt for all sums of money at any time becoming due to said trust estate; to begin and prosecute, defend and settle suits at law, in equity or otherwise; to employ counsel and to compromise or refer to arbitration any claim in favor or against the trust estate. They are also authorized and empowered to do any and all other things which they may deem proper not herein specially enumerated for the protection, preservation, conservation and successful use and management of the trust property.

"5. Said trustees shall, and by the acceptance of this trust they do hereby assume to, pay any and all obligations heretofore entered into, and carry out any and all lawful contracts heretofore entered into, by the party of the first part acting individually or through her agent or attorney, Charles G. Welch. Said trustees shall pay and discharge any and all of said obligations in such manner and at such times as they may deem for the best interests of the trust

Company. William was interested in a company known as the Milwaukee Yacht & Boat Company, and James was interested in a company known as the Atlas Engineering

estate, either out of the corpus of the estate or out of so much of the net income thereof as shall exceed the sum of $12,000 a year.

"6. Said trustees shall keep accurate records of all of their transactions relating to the trust estate, including records of any and all meetings of the trustees. The fiscal year under this trust shall commence on the first of January of each year, and as soon thereafter as practicable said trustees shall prepare a full report of all of the transactions in connection with this trust, which report shall, during the life of the party of the first part, be submitted to her and after her death to the beneficiaries hereinafter referred to, and said party of the first part, or any of said beneficiaries after the death of the party of the first part, shall have the right at any and all convenient times, either by themselves or by their duly authorized agent or attorney, to inspect any and all of said records, and to make copies of the whole or any part thereof, and to examine any and all securities, evidences of indebtedness or other property belonging to said trust estate.

"7. Said trustees may maintain an office for the transaction of the business of said trust and employ all necessary agents and clerks in connection therewith, and all expenditures therefor shall be paid out of the income of said trust estate.

"8. The joint action of a majority of the trustees upon any matter or thing relating to the trust shall bind the trustees and shall be conclusive. So far as strangers to this trust are concerned, a written instrument signed by a majority of the trustees, authorizing any particular act to be done, shall be conclusive evidence in favor of such strangers that such act is the act of the trustees and is within the powers of the trustees hereunder, and no purchaser from the trustees or other person holding any contractual relation with the trustees, shall be bound to see to the application of the purchase money or other consideration paid, or delivered by or for said purchaser to or for said trustees.

"9. The trustees may individually, in good faith, sell any property to the trust estate, purchase any of the trust property from the trust estate or otherwise personally transact business with the trustees and the trust estate.

"10. Any trustee may retire and may be discharged from this trust by presenting his or her resignation in writing to the remaining trustees. In the event of such retirement of any trustee or in the event of the death of a trustee or in case of the inability or refusal of any trustee to act hereunder, the remaining trustees shall, and they are hereby given full power and authority to fill the vacancy so caused. In the event that such remaining trustees cannot agree upon a new trustee to fill such vacancy within ten

Company.   At the time the trust was created, all three of the companies in which the boys were interested were indebted to Margaret F. Welch for moneys loaned to them, and the

days from the time such vacancy occurs, each of said remaining trustees shall, within ten days thereafter, present to a judge of the circuit court in and for Milwaukee county, Wisconsin, two names of proposed trustees, and from the four names so presented to said judge of said circuit court such judge shall select and appoint such successor.   In the event of two simultaneous vacancies in said trusteeship, the remaining trustee shall submit four names of proposed trustees to said judge of said circuit court, and from the names so submitted said judge shall select and appoint two trustees.

"11.   Said trustees, in addition to their necessary expenses in the administration of the trust, shall be paid a compensation of $3,400 per annum collectively, but in the event that the net annual income of said trust estate shall exceed the sum of $34,000, then said trustees shall be paid collectively ten per cent of the total net income annually, said compensation to be divided by the said trustees as they may deem just and proper according to the services performed by each.

"12.   Said trustees shall, from time to time and at such times as may be convenient, pay over to said Margaret F. Welch all of the net income derived from said trust estate during the term of her natural life, except as provided in paragraph five (5) hereof.

"13.   Upon the death of said Margaret F. Welch if any income of said trust estate shall have accrued but shall not have been paid over to said Margaret F. Welch, the same shall become a part and shall be treated as belonging to the corpus or principal of the trust estate and shall be divided as follows:

"14.   Three fourths of all the residue and remainder of said estate remaining in the hands of said trustees at the time of the death of said Margaret F. Welch shall be paid:

"a.   To Charles Gale Welch, William Oscar Welch and James Benjamin Welch, each, upon and in the event of their respective arrivals at the age of thirty years, one ninth (1/9) of said trust property and estate, being one twelfth (1/12) of the entire residue of said trust estate, and said trust shall thereupon cease as to said parts or shares so paid over, assigned or conveyed.   In the event of the death of either one of said named persons prior to the death of said Margaret F. Welch or prior to his arrival at said age of thirty years, said share to which he would have become entitled as above provided, shall continue in trust until the respective arrivals at the age of twenty-one years of the child or children of such deceased person, to be paid over, assigned and conveyed to and distributed among his said child or children in equal parts, share and share alike, upon and in the event of their respectively arriving at said age.   The shares of any that may die before arriving at said age to lapse and to pass to his or her surviving brothers and sisters.

notes evidencing such indebtedness were assigned to the trustees. In 1916, the three sons had become quite seriously involved financially. It was thought that their creditors might

"b. Said trustees shall also pay over, assign and convey to each of said persons named in subparagraph 'A' hereof, upon, and in the event of their respectively arriving at the age of forty years—'provided that each respectively shall, in the judgment of said trustees (they to be the sole judges and their exercise of judgment in this respect to be final and unappealable) then be worthy and of suitable, careful and reliable habits and disposition and sufficiently versed in matters of business to have and receive the same; and if not at that time, then at such time or times thereafter as said trustees may determine to be right and proper,'—another one ninth (1/9) of said trust property and estate, being another one twelfth (1/12) of said entire residue, and said trust shall thereupon cease as to said parts or shares so paid over, assigned or conveyed. However, in the event that any or all of said persons named in subparagraph 'A' hereof shall be more than thirty years of age at the time of the death of said Margaret F. Welch, then there shall elapse between the time of the payments under subparagraph 'A' hereof and under this paragraph at least the period of five (5) years. In the event of the death of any of said persons before his arrival at said age of forty years, or thereafter in case said trustees, in the exercise of the power and discretion hereinbefore given them, have withheld or deferred the payment over, assignment or conveyance of his said share, then said share, to which he would have become entitled at said age as above provided, or of which said trustees are so withholding or deferring payment, assignment or conveyance, shall continue in trust until the respective arrivals at the age of twenty-one years of the child or children of such deceased person, to be paid over, assigned or conveyed to and distributed among his said child or children in equal parts, share and share alike, upon, and in the event of, their respectively arriving at the said age. The shares of any that may die before arriving at said age to lapse and to pass to his or her surviving brothers and sisters.

"c. Upon the respective deaths of said three persons named in subparagraph 'A' hereof, said trustees shall segregate and set aside an even and equal one third (1/3) of the remaining one third (1/3) of said trust property and estate, being one twelfth (1/12) of said entire residue in each case, and as to such part or portion of said trust shall thereupon continue until, but cease and determine upon, the respective arrivals at the age of twenty-one 'years of the child or children of such deceased person,' to be paid over, assigned and conveyed to, and distributed among, his said child or children in equal parts, share and share alike, upon, and in the event of, their respectively arriving at said age, subject, however, to the

proceed against them and obtain their interests, or a portion thereof, in the trust. Counsel for the trustees and for William and James, advised that such a result might be expected

provisions for the widows of such deceased persons mentioned in subparagraph 'D' hereof. The shares of any that may die before arriving at said age to lapse and to pass to his or her surviving brothers and sisters.

"d. The entire net income derived from said trust estate remaining unassigned or undisposed of, shall, by said trustees, from time to time, and at least annually, be paid over and distributed in equal parts, share and share alike, to and among said three persons named in said subparagraph 'A' hereof (with proper allowances and deductions for advancements and partial distributions as hereinbefore provided); in the event of the death of any of said persons leaving children surviving, such surviving children shall be entitled by right of representation to the parent's share of such net income, the same to be used and expended by said trustees for the proper and adequate support, maintenance and education of such surviving children of any such deceased person until the termination of this trust, provided, however, that in case any such person shall leave a widow surviving him, such surviving widow shall, during the period of her widowhood, and if she does not remarry, then for and during the period of her natural life, be entitled to and shall, from time to time and at least annually, have and receive one half (1/2) of the income to which such deceased person would have been entitled if living. Such payment to any such widow, however, shall not continue longer than twenty-one years after the death of her said husband, but in lieu of the continuance of said annual payments she shall receive at the expiration of said period of twenty-one years, if unmarried, such portion of the corpus of said estate as has produced said income.

"15. The entire net income of the remaining one fourth of said trust estate shall, by said trustees, from time to time and at least annually, be paid over unto Corinna G. Hengels for and during the period of her natural life, and after her death, in the event that she shall leave a child or children her surviving, then the said income shall be used and expended by said trustee for the proper and adequate support, maintenance and education of such surviving child or children of said Corinna G. Hengels until its or their arrival at the age of twenty-one years respectively; provided, however, that in case said Corinna G. Hengels shall leave a husband surviving, such surviving husband shall, while he remains unmarried, be entitled to and shall from time to time and at least annually have and receive one half (1/2) of the net income to which said Corinna G. Hengels would have been entitled if living. Such payments of said portion of said income, however, shall not be paid longer than twenty-one years after the death of said Corinna G.

under the terms of the trust deed as drawn. An agreement was entered into on December 30, 1916, between Margaret F. Welch, as party of the first part, the trustees as parties of

Hengels, but in lieu of the continuance of such income there shall be paid to said surviving husband, upon the expiration of said twenty-one years, if unmarried, such portion of the corpus of said trust estate as produced said income.

"A. In the event that said Corinna G. Hengels shall die leaving no child or children or husband surviving her, said entire trust property and estate shall be added to and become part of the trust property and estate governed and to be disposed of by and in accordance with paragraph 14 hereof and subparagraphs from 'A' to 'D' thereof, with like effect as if said paragraph had included the same, or provided for distribution thereof from the time of the death of said Margaret F. Welch—the partial distribution provided for in said paragraph 14 to be increased accordingly. But in the event that said Corinna G. Hengels shall die leaving a husband surviving, then the one half (1/2) of said income which, as above provided, is not to be paid to said surviving husband, and in the event of the remarriage of such surviving husband, then the whole of said income shall be governed and disposed of by and in accordance with said paragraph 14 and the aforesaid subparagraph thereof.

"B. Upon the death of said Corinna G. Hengels and if she leaves a child or children surviving her, said trust created in this paragraph shall thereupon continue until, but shall cease and determine upon, the respective arrivals at the age of twenty-one years of the child or children of the said Corinna G. Hengels, to be paid over, assigned and conveyed to, and distributed among, her said child or children in equal parts, share and share alike, upon and in the event of, their respectively arriving at said age, subject, nevertheless, to the provisions hereinbefore made for the surviving husband, if any, of the said Corinna G. Hengels. The shares of any that may die before arriving at said age to lapse and to pass to his or her surviving brothers and sisters.

"16. In the event of the death of either Charles Gale Welch, William Oscar Welch or James Benjamin Welch leaving no child or children surviving him, his share of said trust estate hereunder shall be added to and become part of the shares of said Charles Gale Welch, William Oscar Welch, James Benjamin Welch and Corinna G. Hengels, or the survivor or survivors of them, in equal parts, share and share alike, subject, however, to all of the trust provisions, conditions and restrictions hereinbefore contained applicable to their respective original shares, provided, however, that in case any of the aforesaid persons shall leave a widow or husband surviving him or her, such surviving widow or husband shall be entitled to the share or shares hereinbefore provided.

the second part, and Charles, William, James, and Corinna G. Hengels, as parties of the third part. That agreement is printed in the margin.[1]

"17. None of the trustees herein provided for shall be required to give any bond or other security as such. Whenever the term 'Trustees' is used in this instrument it shall be construed as including the successors in trust of the parties of the second part.

"In Witness Whereof, the said Margaret F. Welch, and the said parties of the second part, in token of their acceptance of the trust hereby created, have hereunto set their hands and seals the day and year first above written, in duplicate.

> "MARGARET F. WELCH (L. S.)
> "Individually and as Trustee,
> "CHARLES G. WELCH (L. S.)
> "EDWARD R. ESTBERG (L. S.)
> "As Trustees."

[1] "Witnesseth, That whereas in and by that certain deed of trust made and executed the 28th day of October, 1914, between the said grantor and the said trustees, creating and establishing a certain trust whereby the said trustees are constituted and named 'Trustees of Margaret F. Welch,' it was the intention of said grantor that the said parties of the third part, herein called the beneficiaries, were to have a contingent and not a vested interest in said trust and were not to be allowed to alienate the whole or any part of their interests during the continuance of the trust, nor to have the same subjected to the demands or claims of their creditors; and

"Whereas the parties hereto are advised by counsel that the said indenture or trust deed of October 28, 1914, probably fails to correctly express the wishes of the said grantor in such regard, and the said beneficiaries take vested and alienable interests in the said trust fund created by said indenture of trust; and

"Whereas it is the desire of the parties hereto to so modify and amend the said indenture of trust of October 28, 1914, as to make it conform to the wishes and intent of the said Margaret F. Welch;

"Now therefore, in consideration of the premises, it is hereby covenanted and agreed by and between the parties hereto:

"*First:* That the said indenture of trust bearing date the 28th day of October, A. D. 1914, and to which this agreement is annexed, be, and it hereby is, modified so as to provide:

"(a) That the interest of the said beneficiaries, parties hereto, in and to said trust, is contingent and not vested, shall not be alienable by said beneficiaries, or any of them, during the continuance of said trust, nor shall such interest, or any part thereof, while in the hands of said trustees, be subject to the demands or claims of any creditor or creditors of said beneficiaries, or any of them.

"(b) That said trustees are hereby directed and empowered, upon any sum or sums, whether of principal or income, out of said

On the same day, December 30, 1916, and prior to the execution of the agreement just hereinbefore recited, each of the sons, Charles, William, and James, executed and delivered to the trustees an assignment of the whole of his interest in the trust as collateral security for the payment of his indebtedness to the trust estate, or any other indebtedness or liability that might thereafter be contracted by him. At

trust fund becoming due and payable to said beneficiaries, or any of them, upon the death of the said Margaret F. Welch, or the happening of any other of the contingencies provided for in said trust, to pay either such principal or income directly to said beneficiaries, without regard to any conveyance or conveyances made by said beneficiaries, or any of them, whether voluntarily or by operation of law, of their respective rights or interests subsequent to the date hereof and without regard to the claim or judgment of any creditor or creditors of said beneficiaries, or any of them, whose debt was incurred subsequent to the date hereof.

"(c) In case the said beneficiaries William O. Welch, Charles G. Welch or James B. Welch, or any of them, shall hereafter make any assignment or conveyance of their, or any part of their, interest in the principal or corpus of said trust, or shall be adjudicated a bankrupt or insolvent pursuant to any law of the United States, or of any of the states, prior to the time or times when such beneficiary or beneficiaries would be entitled to a distributive share in the principal or corpus of said trust fund, then, and in such case, such trustees may, in their discretion, withhold the payment of such beneficiary's share in such principal or corpus of such trust fund until such later date as to said trustees may seem proper, or, in the discretion of said trustees, may hold such share of such beneficiary or beneficiaries during the lifetime of such beneficiary or beneficiaries upon the same terms and conditions as provided for the one ninth (1/9) which is to be held by said trustees during the lifetime of said beneficiaries, as provided in subparagraph (b) of article 14 of said original trust agreement, and upon the death of said beneficiary or beneficiaries said trustee shall distribute all of said principal or corpus as provided for said last one ninth (1/9) in said subparagraph (b) of said article 14; such beneficiary or beneficiaries shall, however, receive the net income of said proportion of principal or corpus so withheld in the discretion of said trustees during his or their lifetime in the same manner as provided for the said final one ninth (1/9), and subject in all respects to the terms and conditions of said original trust agreement as modified by these presents.

"Second: The said beneficiaries, and each of them, hereby assign, transfer and set over unto said trustees, and their successors in said trust, so much of their respective interests in and to said trust as

the same time Charles acknowledged an indebtedness of $20,500, William, $48,172.07, and James, $16,272. The assignment of William, which is identical with that executed by Charles and James, with the exception of the recited indebtedness, is printed in the margin.[1]

may be necessary to carry into effect the covenants and agreements hereinbefore contained.

"*Third:* In all other respects the said indenture of trust dated the 28th of October, 1914, and hereto prefixed, is ratified, established and confirmed.

"*Fourth:* It is hereby specifically covenanted and agreed that nothing herein contained is intended to or shall in any way or manner change, alter or abridge the rights, interests or claims of any other person or persons interested in said trust other than the parties hereto and whether now in being or hereafter to be born.

"*Fifth:* It is further specially covenanted and agreed that nothing herein contained shall affect or be intended to affect the rights or remedies of any creditor or creditors, or assignee or assignees, of said beneficiaries, or any of them, now existing, specifically including herein as creditors the said trustees, and preserving all rights of said trustees under any assignment or conveyance heretofore made by any of said beneficiaries.

"In Witness Whereof the parties hereto have hereunto set their hands and seals the day and year first above written."

[1] "To Margaret F. Welch, Charles G. Welch and Ed. R. Estberg, Trustees of Margaret F. Welch:

"Whereas, W. O. Welch, one of the beneficiaries under that certain indenture or deed of trust of date the 28th of October, A. D. 1914, between Margaret F. Welch, of the first part, and Margaret F. Welch, Charles G. Welch and Ed. R. Estberg, of the second part, as trustees, has heretofore borrowed money from the said trustees, and is now indebted to said trustees in the sum of forty-eight thousand one hundred seventy-two and 7/100 dollars ($48,172.07) on his own account, and on account of companies or corporations in which he is interested, evidenced by notes or other written instruments, or by open account, as detailed in memorandum approved in writing by the said W. O. Welch; and

"Whereas, said trustees have requested that the undersigned furnish additional security for the indebtedness aforesaid,

"Now therefore, in consideration of the premises, and of other valuable considerations, the receipt of which is hereby acknowledged, W. O. Welch, the undersigned, hereby assigns, transfers, sells and sets over to Margaret F. Welch, Charles G. Welch and Ed. R. Estberg, trustees under said deed of trust of the 28th of October, 1914, as aforesaid, and their respective successors in said trust, the whole of his respective interest in and to said trust, by

The trustees, from time to time, and up to July 1, 1920, paid all of the net income of the trust estate to Margaret F. Welch. On July 10, 1920, she delivered to the trustees an instrument, duly witnessed, whereby she directed the trustees to pay all of the net income in said trust estate, in excess of $14,000, to her children. The directions given the trustees were complied with by them and the income of the trust estate, in excess of $14,000 which accrued after July 1, 1920, was paid to the children of Margaret F. Welch, until January 31, 1921, when the directions theretofore given were modified. The instrument of July 10, 1920, just referred to, with the caption and signature eliminated, is as follows:

"On the 28th day of October, 1914, I executed a declaration of trust, which was subsequently modified in some minor particulars. Under this writing the trustees have the right to use any income above $12,000 to pay off obligations.

"I have been making allowances to my children from the income that has been paid over to me. These allowances have varied in amounts. In view of plans that I have talked over with my son, Gale, I have decided to settle matters definitely so that my children shall receive certain allowances

said deed created as aforesaid, as collateral security for the payment of the indebtedness as aforesaid, or any other indebtedness or liability of the undersigned to said trustees that may be hereafter contracted by the undersigned; and the undersigned hereby authorizes, empowers and directs said trustees, or their successors in trust, to deduct from the undersigned's share in said estate as the same may become vested, the indebtedness of the undersigned to said estate at such time or times, and in the event that the interest of the undersigned in said estate at such time or times is not represented by sufficient cash to fully pay and discharge said indebtedness, said trustees, or their successors in trust, are hereby given full power and authority to sell, assign and deliver the whole of said property, or any part thereof, at public or private sale, at the option of said trustees, or their successors, and that after deducting all legal or other costs and expenses for collection and delivery, to apply the residue of the proceeds of such sale or sales so to be made, to pay any, either or all of said indebtedness of the undersigned to the said trustees, returning the overplus, if any, to the undersigned."

from the estate in order that they may know in the future that they have an income on which to rely.

"Because of my desire to relieve my children from anxiety, due to the plans that I have talked over with my son, Gale, as to what their income will be during my life, and to settle the amount that they will receive, I direct the trustees, commencing July 1, 1920, and thereafter during the remainder of my life, to pay any income that may be derived from the trust estate over and above the sum of $14,000 a year, which the trustees, in their discretion, deem can be paid without injury to the estate, to my children in equal proportions either monthly or quarterly, as the trustees may deem best.

"I have made the sum $14,000 to be reserved and paid to myself, instead of the $12,000 mentioned in the trust deed, for the reason that I feel that I may possibly need more than $12,000 because of the recent increase in the cost of living.

"In the event of the death of any of my children, the share of the one dying shall be used for the benefit of their children, if they have any. If they have no children, then the proportion shall be used for my surviving children.

"This letter of instruction shall be considered as an irrevocable assignment, for the benefit of my children, of all income of the trust estate above the sum of $14,000 per annum."

The instrument of January 31, 1921, hereinbefore referred to, modified the instructions given in the instrument of July 10, 1920, so as to provide that all of the income of the trust in excess of the sum of $12,000 per year, which she reserved to herself, should be paid to her children. The trustees carried out the directions given them by Mrs. Welch up to the time of her death, which occurred on June 21, 1923.

Upon the death of Mrs. Welch, the surviving trustees did not appoint a trustee to succeed her. They desired to appoint Corinna G. Hengels as trustee, but as such appointment was opposed by both William and James, no appointment of a third trustee was made until 1934 when Mr. Hengels was appointed. However, during a brief interim when Mr. Estberg was in Europe, Mr. Hengels was appointed as

trustee. Upon the return of Mr. Estberg, Mr. Hengels resigned, leaving only the defendants as trustees.

During all of their trusteeship, from the beginning of the trust down to the time of the death of Mrs. Welch and at all times thereafter, the trustees considered that the trust deed gave them very broad powers as to retaining investments which originally were a part of the trust estate and in making new investments for the trust. They considered that they were not governed by the provisions of ch. 320, Stats., relating to trust-fund investments. They accordingly retained many of the original investments and from time to time made new investments which concededly were not proper, if the trustees under the trust deed were authorized to invest trust funds only in such securities as are authorized by ch. 320, Stats.

No distribution of the first one fourth of the trust estate among the three boys was made immediately after the death of Mrs. Welch, although they were all of the age of thirty years. Distribution was reserved until about 1930. At that time the shares to which they were entitled were more or less equal to the amount of the moneys and properties that had theretofore been advanced to them, which advancements were treated as loans secured by their assignments of their interests in the trust estate.

This general statement of the facts is sufficient to show the nature and purposes of the trust and the practical construction given to the trust deed by the settlor, the trustees, and the sons and daughter.

It may be well, at the outset, to state several propositions of law which at all times should be kept in mind. (1) In construing a trust, whether created by a will or by another instrument, the language thereof should be so construed as to give effect to the intention of the testator or settlor, if that intention may be ascertained from the language of the will or other instrument, considered in the light of the surround-

ing circumstances. That rule repeatedly stated in connection with the construction of wills, has become elementary. It has also been stated in connection with the construction of a trust not created by will. *Miller v. Douglass,* 192 Wis. 486, 492, 213 N. W. 320.

(2) Findings of fact made by a trial court, in controversies concerning the administration of a trust estate, are accorded the same effect that findings of fact are accorded in other controversies. As was said in *Estate of Allis,* 191 Wis. 23, 33, 209 N. W. 945, 210 N. W. 418:

"This court does not weigh the evidence on appeal as if it were sitting as a trial court. It will not disturb the findings of the trial court unless they are contrary to the great weight and clear preponderance of the evidence."

In considering the numerous assignments of error, it is important that the following undisputed facts be kept in mind: On October 28, 1914, Margaret Welch was a widow and the sole owner and possessor of a large estate which she had received under the will of her deceased husband, about three years before. She had already given to her four children the sum of $200,000. She had had all of the income since the property was turned over to her pursuant to the final judgment of the county court. She had incurred an indebtedness of about $118,000 by borrowing from banks. Either she or Charles G. Welch, her attorney in fact, had incurred other indebtedness. She desired to be relieved from the burdens and responsibilities of managing her large estate. She was the mother of four children, whose names and approximate ages were as follows: Corinna, aged thirty-nine, who was married to Henry C. Hengels; Charles, aged thirty-three; William, aged thirty-one; and James, aged twenty-six. Each of the sons, at that time, had already become interested in separate business enterprises. To each of the companies in which the boys were interested she had advanced moneys in

considerable amounts. She had organized the Welch Invest-
ment Company, a Michigan corporation, for the purpose of
taking title to the real estate located at Seventh street and
Wisconsin avenue, and had conveyed to it the real estate
mentioned in exchange for one thousand nine hundred ninety-
six shares of its capital stock, which were issued to her, and
one share each to Charles, William, James, and Henry C.
Hengels. The remaining properties, constituting her estate,
were those which she had received from the executors of the
will of her deceased husband, and were, in large part, the
very investments which her deceased husband had made in
his lifetime. The beneficiaries of the trust were herself, her
four children, her grandchildren, her son-in-law, and her
daughters-in-law. It was a trust, the beneficiaries of which,
vested and contingent, were the members of her immediate
family, including her grandchildren. The trust deed was
drawn by Harrison Green, a member of the Milwaukee bar.
From 1914, when the trust deed was executed, to 1923, when
Mrs. Welch died, she was one of the trustees, though not as
actively engaged in the administration of the trust as were
her cotrustees, the defendants here. Mrs. Welch, however,
was, from time to time, consulted in regard to important
matters. The trust estate and the doings of the trustees were
annually audited by competent accountants, and copies of
their reports were delivered to her, to each of the sons, and
to Mrs. Hengels. Such reports up to 1929 were approved
in writing by the three sons and daughter.

In discussing the numerous assignments of error, repeti-
tion of some of the facts will doubtless occur, but, in the
interest of clarity, that can hardly be avoided.

The appellants first contend that the trial court failed to
keep in mind the basic principles of law applicable to trusts
and trustees. This contention is based largely upon the fact
that the trial court did not construe the trust deed in accord-
ance with the contentions of the appellants, and did not apply

to the administration of the trust, the strict law applicable to investments by trustees contained in ch. 320, Stats. At the outset of the trial briefs were submitted by counsel, including the guardian *ad litem,* in which the issues and the law applicable to trusts and trustees were fully recited. There is nothing in the record to indicate that the learned and experienced trial court did not keep in mind the applicable law. In our opinion, the appellants' first contention is without merit.

The appellants next contend that the trial court erred in failing to keep in mind that the original trust deed, together with the agreement of December 30, 1916, created what is known as a spendthrift trust so far as the four adult beneficiaries, Charles, William, James, and Corinna were concerned, which could not be amended or altered even with the consent of such beneficiaries. The original trust deed contained none of those provisions, ordinarily found in trusts created for the benefit of spendthrifts, such as a strictly limited income, payable only at certain times and not subject to the claims of creditors. See *Bowlin v. Citizens Bank & Trust Co.* 131 Ark. 97, 198 S. W. 288, 2 A. L. R. 575. While it was the opinion of counsel for the settlor, the trustees, and the plaintiffs herein, that the original trust deed probably gave to Charles, William, and James vested interests in the principal of the trust estate, at least so far as the first one fourth thereof was concerned, which were assignable and therefore subject to claims of creditors, and while the agreement of December 30, 1916, was obviously intended to change their interests in that one fourth from vested to contingent interests, subject, however, to the rights of all then existing creditors, there is nothing in either instrument, when considered in connection with the assignments which were executed immediately before the agreement was entered into, to warrant the assertion that the trustees could not from time to time make advancements to such beneficiaries and

treat such advancements as loans.  The assignments of their interests in the estate as security for their then existing indebtedness to the trustees and as security for any other indebtedness or liability that might be contracted by them, clearly evidence the intent of all concerned.  It is clear that the plaintiffs can have no claim against the trustees because moneys were advanced to them, which were treated as interest-bearing loans secured by their interests in the trust estate, which they had assigned to the trustees.  They do not question that the amounts advanced to them, plus interest, amounted to a full distribution of their interests in the first one fourth of the trust estate.  Nor is there basis for complaint by the interpleaded defendants, minors or adults, since at the time of that distribution Mrs. Welch, the settlor, had died and the adult beneficiaries had all attained to the age of thirty years.  None of them had any interest in that distribution, if the amount thereof was fair and just.

The appellants next contend that the trial court erred in not holding that it was the duty of the trustees to convert all nonlegal investments into such investments as are specified in ch. 320, Stats.  The trial court found that the trust deed contained:

"Clear and unequivocal statements of an intent to confer the broadest kind of powers upon the trustees in exercising their discretion in the execution of the trust, and the trustees by the use of this language are not restricted to the conditions and limitations imposed by law for the investment of trust funds.  All the investments made by the trustees were made in accordance with the broad powers conferred upon them and were made in the exercise of their sound discretion."

That construction was largely based upon the language contained in paragraphs 2, 3, and 9 of the trust deed.

That the settlor intended to give to the trustees very broad powers, there can be no doubt.  The language contained in

those paragraphs is much broader than the language construed in *In re Allis's Estate,* 123 Wis. 223, 225, 229, 101 N. W. 365. The language in the Allis will was as follows:

" 'To sell, mortgage, or lease said real estate; convey or exchange the same; convert the realty into personalty or personalty into realty; and so to do with any and all parts of said estate; granting to them full power and authority in their discretion to invest, reinvest and employ said real estate and generally manage the same; to continue the same as it is invested at the time of my death—and especially as invested in the E. P. Allis Company, or to change such investments; to receive and collect such profits and income thereof, and to dispose of the net income as follows.' "

It was there said:

"The powers thus conferred are of the broadest kind, and are to be exercised by the trustees, in their discretion, in the execution of the trust. The purpose of the testator, manifested in this and other provisions of the will, evidently was to have the trustees invest and employ the *corpus* of the estate in obtaining securities in kind like those specified in the will; and he contemplated that they should purchase such securities as a prudent and provident person would purchase as good and safe investments, and that they should not be restricted to the conditions and limitations imposed by law for the investment of trust funds. Under the powers so given the trustees, and the facts found by the court, these investments 'were such as an ordinarily prudent person would make, having regard to the permanence and security of the principal, as well as the production of an income for the beneficiaries under the will;' and we hold that the trustees, in purchasing these securities, acted within the authority and direction as expressed in the will, and the court properly approved them."

The investments there considered had been made prior to the enactment of ch. 317, Laws of 1903 (ch. 320, Stats.), when the law limited trustees to such investments as were approved in *Simmons v. Oliver,* 74 Wis. 633, 43 N. W. 561.

This court affirmed the county court which had held that the trustees did not violate the broad powers given them in investing in stock of the Chicago, Milwaukee & St. Paul Railroad Company and the Milwaukee Electric Railway & Light Company. In *Estate of Allis,* 191 Wis. 23, 209 N. W. 945, 210 N. W. 418, the question for determination was whether the retention of those investments by the trustees, in the face of a declining market, was proper. *In re Allis's Estate, supra,* was referred to, and it was said (p. 32) :

"In determining the liability of the trustees, the administration of the estate by the Trust Company must be viewed in the light of the powers conferred upon the trustees by the will as well as in the light of the duties and liabilities imposed by the well-established rules of law to which attention has been directed. By the broad powers given the trustees by his will the testator has taken the case out of the strict rules that ordinarily define the duties and responsibilities of trustees by vesting in them very broad powers as to the investment of the funds of the trust estate."

It was further said (p. 33) :

"It is the rule that trustees are not to be exempt from these strict rules 'without a clear and unequivocal statement of intention to that effect made by the maker of the trust in the instrument creating or evidencing it.' *Babbitt v. Fidelity Trust Co.* 72 N. J. Eq. 745, 758, 66 Atl. 1076, 1081. But the will of Ernest Allis contains such clear and unequivocal statement of an intent to confer the broadest kind of powers upon the trustees to be exercised in their discretion in the execution of the trust. But even under the broad powers conferred it was the duty of the trustees to exercise a reasonable and not an arbitrary discretion, to execute the trust in accordance with existing laws governing trustees under like powers in the execution of their trust. *Pabst v. Goodrich,* 133 Wis. 43, 72, 113 N. W. 398."

In *Pabst v. Goodrich,* 133 Wis. 43, 50, 113 N. W. 398, one of the questions concerned the authority of the trustees

to make an investment in the stock of a company located in Germany and engaged in the manufacture of champagne. The language of the trust there considered, was as follows:

" 'I hereby confer upon said executors and trustees full power and authority to manage and control said property according to their judgment and discretion, and to sell and dispose of any portion thereof, including any real estate, also said homestead, during the life of my wife if she shall desire it and consent thereto. And I give them full authority to invest the trust properties in such manner as they shall deem best, with no responsibility for losses, provided they act honestly and in good faith.' "

It was there held (p. 72) that the language conferred a very broad power upon the trustees, but that the trustees were required to exercise "a reasonable and not an arbitrary discretion, and to imply a duty to execute the trust in accordance with existing laws governing trustees in the execution of their trust." In using that language, it is clear that the court was not referring to the statutory law (ch. 320, Stats.) which is applicable to trustees not having broad powers. The court further stated (p. 74):

"There can be no doubt, under a power broad as the one under consideration, that the trustees are bound to act in good faith and exercise a sound judgment and prudent discretion in making an investment. They are bound to look to the interests of the remainderman as well as to those of the life tenant, and place the trust estate in no hazardous position."

Following the general rule that a trustee, even with broad powers, should not make foreign investments, the court concluded that the testator did not intend to confer such powers upon the trustee. The rule, therefore, may be said to be well established that where broad powers are given to trustees with respect to investments they are not bound to comply with the provisions of ch. 320, Stats., as to retaining invest-

ments or making new ones or converting nonlegal investments into legals within a reasonable time.

The language of the trust deed does not support the contention of the appellants that the settlor intended to limit the trustees to such investments only as are permissible under ch. 320, Stats.

The particular contention of the appellants under this assignment of error is that the trustees were bound to dispose of one thousand nine hundred ninety-six shares of stock of the Welch Investment Company within a reasonable time after the creation of the trust, and that had they done so, the trust would not have sustained what presently appears to be a large book loss in that investment. Had the trustees offered to sell the stock in the Welch Investment Company during the years 1925 to October, 1929, when the depression broke, they doubtless could have obtained a price greatly in excess of the present depressed value of that stock, but, under the broad powers given them, they were not bound to do so. In the exercise of their discretion they were, of course, required to act as prudent and provident persons would act under the same or similar circumstances. It is without dispute that Charles Welch, Sr., in his lifetime, purchased the real estate at Seventh street and Wisconsin avenue; that it was regarded by him as a very valuable piece of property, with certain prospects of becoming increasingly valuable. since it was located on the most important street in the city of Milwaukee and but a few blocks from the very heart of the business section thereof; that he believed and so expressed himself, that it should be held as a permanent investment; that Mrs. Welch, the settlor, prior to the creation of the trust, organized a corporation for the sole purpose of holding and managing that property; that, after the trust was created, she served as one of the trustees for nearly nine years and approved of the holding of the stock in that company; that during those years, the property was improved by its board

of directors with funds borrowed for that purpose; that one of the plaintiffs (James) was a member of the board of directors; that the other plaintiff, William, as late as April 24, 1925, expressed his faith in that investment by writing to the trustees, in part, as follows:

"We have had a sad experience in Montana. On the other hand, we can look at the purchase of the property in Milwaukee at the corner of Grand avenue and Seventh street and thank our lucky stars it was made;"

that the property, as improved, had become a very profitable investment when the depression struck in 1929; that thereafter profitable leases expired and were not renewed, as a consequence of which the rental income fell off; that, for a time, the property was operated at a loss; that, as a result of the depression, real-estate values were greatly depressed; that at no time since 1932 or 1933 could the property have been sold for any price approximating its value under normal conditions, and that, at the time of the trial, the property was practically on a self-sustaining basis, with considerable space available for additional tenants.

It is our opinion that the trustees were justified in retaining the investment represented by the stock of the Welch Investment Company. At the time the depression struck, it had become a highly profitable investment. Through no fault of the trustees, the depression came, and with it the speedy destruction of values of all property. To have disposed of the stock held by them after its value was so greatly depressed, would, in our opinion, have been very improvident. In a city like Milwaukee, there is every reason to believe that, with the return of normal times, values will be restored, especially as to properties located on its principal business street and within a few blocks of the very heart of its business section. In our opinion, the trial court was right in holding that under the broad powers conferred upon the

trustees they were not required to dispose of the Welch Investment Company stock and were without fault as trustees in retaining it as an investment. The contention that the trustees violated their duties because they did not dispose of the Welch Investment Company stock, is without merit.

It is next contended that the trial court erred in not holding the trustees liable for losses sustained by the trust on certain stocks and bonds which were a part of the corpus of the trust at the time of its creation, which it is asserted, the trustees should have disposed of within a reasonable time and converted into such investments as are authorized by ch. 320, Stats. Under this assignment of error, bonds of four railroad, interurban, and gas companies are listed which, it is contended, should have been disposed of, and the failure of the trustees to dispose of them, has occasioned a loss to the trust amounting to $19,482.75. This asserted loss is computed by subtracting the market value of such bonds as of December 31, 1937, from the original cost thereof. This contention is grounded upon the assertion that, under the terms of the trust deed, it was the duty of the trustees to convert, within a reasonable time, all nonlegal investments into such investments as trustees are authorized by ch. 320, Stats., to make. In support of that contention numerous authorities are cited. *Estate of Dreier,* 204 Wis. 221, 235 N. W. 439; *Estate of Fouks,* 213 Wis. 550, 252 N. W. 160; *Estate of Grotenrath,* 217 Wis. 109, 258 N. W. 453; *Estate of George,* 225 Wis. 251, 270 N. W. 538, 274 N. W. 294; *Guardianship of Farness,* 225 Wis. 383, 273 N. W. 522. In all of those cases, trusteeships unquestionably subject to the provisions of ch. 320, Stats., were considered. The law of those cases is the established law of this state and we are not disposed to retract anything that was there said. However, the strict law of those cases is not applicable to trustees who have been given what this court has said constitutes the broadest powers and authority in connection with the ad-

ministration of a trust. What was said in discussing the third assignment of error just hereinbefore discussed, is applicable here. The trial court found, in substance, that the trustees had carefully considered from time to time which of the trust assets should be retained and which disposed of; that they acted very carefully and prudently in that regard; that in determining which assets should be held and which should be disposed of they had consulted statistical reports of the companies whose securities the trust estate held; that they consulted frequently with people familiar with the different classes of investments held by them; that they had very carefully and prudently considered all investments held by the trust, and that as to some investments held by them it had been impossible for the trustees to dispose of them because of the rapidly declining market conditions that had resulted from and prevailed during the unprecedented depression which began late in the year 1929, and that they had had no opportunity since the precipitous decline caused by the depression to dispose of them except at prices far below the intrinsic value thereof. The testimony of the trustees regarding the retention as investments of the bonds complained of amply supports the finding and conclusion of the trial court to the effect that in retaining the bonds the trustees exercised a reasonable, not an arbitrary discretion, and that they exercised sound judgment and a prudent discretion in retaining such investments under all of the circumstances. When the depression broke, the several companies were paying their interest promptly from adequate earnings. No one at that time could have foreseen that property values would be so greatly depressed for so many years. The situation which confronted the trustees was in many respects similar to that considered in *Estate of Allis, supra*. It was there said (p. 35):

"In determining whether the findings of the county court are supported by the evidence we must view the situation as

it should have appeared to vigilant trustees during the years when they were charged with the responsibility of deciding what should be done with this stock.  [St. Paul railroad stock.]  We can now see that it would have been wiser to sell the stock.  But in judging the trustees' acts we should put ourselves in their position at the time."

In Restatement, Trusts, p. 675, § 231, it is said:

".  .  .  So also, in times of panic when prices of securities fall below what he reasonably regards as their fair value owing to forced selling, he is not under a duty to sell even securities which are listed on a stock exchange and have a ready market.  On the other hand, he is subject to liability if without exercising a reasonable amount of prudence he sells at an unnecessary sacrifice.  .  .  ."

In our opinion, the fourth assignment of error is without merit.

The appellants next contend that the court erred in failing to hold the trustees liable for losses on stocks which were purchased by the trustees after the creation of the trust and which stocks are still in their possession.  This contention is likewise based upon the assertion that the trustees in making investments were strictly limited to the trust-fund investments provided by ch. 320, Stats.

The trustees invested trust funds in stocks of American Telephone & Telegraph Company, Anaconda Copper Company, Bethlehem Steel Company, Standard Oil of New Jersey, Seattle Gas Company, and Texas Electric Railway. Subtracting the value of those stocks at the time of the trial from the purchase price thereof, shows a comparatively large book-value loss of $38,500.29.  Such of those stocks as are listed on the New York stock exchange have materially increased in value since the trial.  Seattle Gas Company and Texas Electric Railway have undergone reorganization during the depression.  Under the broad powers given to the trustees they were authorized to make prudent investments

in stocks, although such investments would not have been legal by trustees, subject to the provisions of ch. 320, Stats. The court found in respect to investments made by the trustees, in substance, that in making investments for the trust estate, the trustees investigated each investment thoroughly before making the investment, and also consulted people familiar with the investment under consideration; that they, at all times during the administration of the trust, had considered very carefully and prudently all of the investments made by them, and that they were in no way responsible for the decline in the market value of any of the stocks which are now held by the trust estate. The testimony of the trustees bearing upon the investments in the stocks complained of amply supports the findings of the trial court. In passing upon such questions, courts must consider the situation as it appeared to vigilant trustees charged with the responsibility of investing funds belonging to a trust when the investments were made. As stated in Restatement, Trusts, p. 652, § 227:

". . . Whether the trustee has acted properly in making an investment depends upon the circumstances at the time when the investment is made and not upon subsequent events. If at the time when the trustee makes an investment it is an investment which a prudent man would make at that time, he incurs no liability although subsequently the investment depreciates in value. . . ."

We conclude that the findings and conclusions of the trial court with respect to the investments complained of are supported by the evidence and may not be disturbed. In our opinion, the fifth assignment of error is without merit.

It is next contended that the trial court erred in failing to hold that the trustees were liable for an asserted loss of $52,273.38 occasioned by their loaning $55,000 to the Western Farm Land Company, a corporation. This assignment of error is also grounded upon the fact that it was not a

permissible loan under the provisions of ch. 320, Stats., and upon the assertion that the investment was a total loss. We have already held that the language of the trust deed granted the broadest powers to the trustees and that the trustees, in making investments, were not governed by the provisions of ch. 320, Stats. The facts found by the trial court regarding the Western Farm Land Company and the loans made to it by the trustees, for which there is ample support in the evidence, may be summarized as follows: Western Farm Land Company is a Wisconsin corporation, organized by Harrison S. Green and Charles A. Welch (the father). It was organized for the purpose of buying and selling Montana lands which Mr. Welch considered would prove very profitable. The capital stock of the company was $60,000. The company acquired 5,812.24 acres of Montana land for which it paid, or agreed to pay, an average price of about $23 per acre. The original stockholders and the shares held by them were as follows:

| | |
|---|---|
| Harrison S. Green | 200 shares |
| H. P. Pruden | 22½ shares |
| Alice Shannon | 50 shares |
| Charles G. Welch | 50 shares |
| William O. Welch | 50 shares |
| James B. Welch | 50 shares |
| Henry C. Hengels | 50 shares |
| Estate of Charles A. Welch | 123 shares |
| R. S. Marshall | 4½ shares |

Prior to the creation of the trust, the shares of Mr. Pruden and William O. Welch were purchased by either the estate or by Mrs. Welch, so that at the time of the creation of the trust the trustees received one hundred ninety-five and one-half shares under the trust deed. At that time $19,400 had been loaned to the Western Farm Land Company, either by Mr. Welch, Sr., or by Mrs. Welch. The lands purchased were considered good grain lands. In 1915, the company

was indebted to a Montana bank in the sum of $50,000, secured by a first mortgage on five thousand eight hundred odd acres of land. Charles G. Welch, in 1915, personally inspected the lands and recommended to his cotrustees, Mrs. Welch and Mr. Estberg, that the trustees take over the $50,000 mortgage loan. At that time the prospect of disposing of the lands was very good. The result was that the trustees loaned $50,000 to the company and received a mortgage for $50,000, which, strictly speaking, was second to a $5,000 mortgage then held by the trustees. By 1916, approximately three thousand five hundred acres of land had been sold by the company under land contracts for $45 per acre and eight hundred eighty-five acres had been sold under land contracts for $50 per acre. By 1923, however, many purchasers had defaulted so that there had come back to the company lands which, together with what the company owned, totaled 5,332.34 acres. By December, 1928, the company had again sold all of its lands with the exception of 783.19 acres. Since about 1930, severe drought conditions have prevailed in Montana and the company has encountered difficulties in collecting on its land contracts. However, the principal of the mortgage held by the trustees has been paid down to $37,000, although the unpaid accumulated interest as of December 31, 1937, amounted to $15,273.38. The lands belonging to the company were appraised in 1927, by Mr. August Vogel, Mr. Hunter, the land commissioner of the Milwaukee railroad, Mr. Cook, the company's agent at Lewiston, and by Charles G. Welch. In the opinion of Mr. Welch, the lands were worth a sufficient sum to liquidate the mortgage and to make the preferred stock held by the trust of substantial value. The trial court found that "the trustees, in investing the funds of the trust estate in the mortgage of the Western Farm Land Company, acted within the powers conferred upon them under the trust deed, and as it was the judgment of the trustees that the investment in the

Western Farm Land Company mortgage was safe and sound, and an investment which the trustees should make, there is no liability on the part of the trustees for making the investment in the mortgage of the Western Farm Land Company." In considering findings of the trial court regarding the investment made by the trustees in 1915, the situation must be viewed as it should have appeared to vigilant trustees at the time the investment was made. *Estate of Allis, supra;* Restatement, Trusts, p. 652, § 227. "Whether the trustee has acted properly in making an investment, depends upon the circumstances at the time when the investment is made and not upon subsequent events." At the time the investment was made the trustees owned one hundred ninety-five and one-half shares of stock in the company. They also owned notes of the company, the principal and accrued interest of which amounted to about $30,400. The purchase price of the lands was about $23 per acre. The willingness of purchasers to enter into contracts to pay $45 to $50 an acre is convincing evidence as to the value of the company's lands at about that time. The company had few stockholders and was a closed corporation. There was no market for the stock. Under all of the circumstances which the trial court found existed in 1915, we think the findings and conclusions of the trial court exonerating the trustees of any liability on account of the mortgage loan to the land company cannot be disturbed.

It is next contended that the trial court erred in failing to surcharge the trustees for excessive expenses claimed to have been paid by them in the operation of the trust. The expenses complained of included wages of office employees, rent, supplies, postage, telephone and telegraph, stationery and printing, traveling expenses, subscriptions and services, etc. No charge is made that the expenses were not in fact incurred and paid. The trust deed specifically authorized the trustees to "maintain an office for the transaction of the busi-

ness of said trust and employ all necessary agents and clerks in connection therewith, and all expenditures therefor shall be paid out of the income of said trust estate." All of the expenses incurred and paid from time to time were correctly listed in the annual audits submitted to the adult beneficiaries who, in writing, approved of such audits. The trial court did not specifically pass upon the propriety of the expense items but did inferentially do so in otherwise passing upon the net income distributed. The expenses were all paid out of income, and since Mrs. Welch and the adult beneficiaries made no objections to the amount of the expenses of maintaining an office, the claims of the plaintiffs must be held to be without merit.

It is next contended that the trial court erred in finding that the trustees, Charles G. Welch and Ed. R. Estberg, were entitled to retain the compensation received by them from the date of the death of Mrs. Welch, the settlor, on June 22, 1923, to the date that Henry C. ·Hengels was appointed a trustee on November 27, 1934, to succeed her. This contention is based upon the assertion that upon the death of Mrs. Welch it was the imperative duty immediately to appoint a trustee to fill the vacancy. The trust deed, paragraph 10, in part provided:

"In the event of the death of a trustee . . . the remaining trustees shall, and they are hereby given full power and authority to fill the vacancy so caused. In the event that such remaining trustees cannot agree upon a new trustee to fill such vacancy within ten days from the time such vacancy occurs, each of said remaining trustees shall, within ten days thereafter, present to a judge of the circuit court in and for Milwaukee county, Wisconsin, two names of proposed trustees, and from the four names so presented to said judge . . . such judge shall select and appoint such successor."

The trial court found in substance that shortly after the death of Mrs. Welch, the surviving trustees decided to ap-

point Corinna G. Hengels as successor trustee; that the matter of appointing her as a successor trustee was discussed with the plaintiffs; that both of them were opposed to her being appointed and suggested that the appointment of a successor trustee be withheld; that "by reason of the language of the trust deed . . . whereby the trust estate is conveyed to the trustees as joint tenants and not as tenants in common, and to the survivor or survivors of them, Charles G. Welch and Edward R. Estberg, as surviving trustees, had all of the powers conferred upon the trustees by the trust deed and had power to carry out all of the terms and conditions of said trust deed, and had all of the rights, benefits and privileges conferred upon the trustees by said trust deed." (Finding 6.) The court concluded that said trustees "had and now have all of the powers, rights and privileges conferred on the trustees by the trust deed." (Conclusion 4.)

While it was doubtless the intention of the settlor to have the trust administered by three trustees, it likewise appears that the concurrent action of any two trustees would bind the trust. All matters complained of were concurred in by the two surviving trustees. During the period from the death of Mrs. Welch, up to the appointment of Mr. Hengels as trustee in 1934, the trust was administered by the surviving trustees. Under all of the circumstances, we consider that the trial court was justified in refusing to require the trustees to return to the trust estate the salaries paid to them throughout that period.

The appellants next contend that the trial court erred in refusing to surcharge the trustees in the sum of $5,700, with interest, in the so-called Alice Shannon transaction. The facts, as found by the trial court, and as supported by the evidence, are in substance as follows: For about seventeen years prior to the death of Mr. Welch in 1910, Miss Shannon had been in his employ. When he and Mr. Green

organized the Western Farm Land Company, hereinbefore mentioned, Mr. Welch was very hopeful that the investment would prove highly profitable. He wanted some of his employees to share in the profits. He sold twenty-two and one-half shares of the common stock to H. P. Pruden, an employee, and agreed in writing to take the stock back for the price paid together with interest at six per cent at any time Mr. Pruden so requested. In compliance with that contract, Mrs. Welch, prior to the creation of the trust, on March 21, 1911, purchased Mr. Pruden's stock. Miss Shannon purchased fifty shares of the common stock under similar circumstances, but under an oral agreement of Mr. Welch to repurchase, with interest. She paid $1,000 in cash for the stock and gave two notes for the balance of $4,000. After the death of Mr. Welch, Miss Shannon advised Charles G. Welch, who had a power of attorney to represent his mother, Mrs. Welch, of the agreement which Mr. Welch had made with her in reference to taking back the fifty shares of stock. He told her that any arrangement that his father had made would be good with his mother and him. After the trust was created, and pursuant to the acknowledgment of indebtedness made by him on behalf of Mrs. Welch, the trustees purchased from Miss Shannon the fifty shares of stock by canceling her notes for $6,000 which the trust estate held and giving her two bonds, the market value of which equaled the $1,000 paid by her, together with interest thereon. Paragraph 5 of the trust deed provides:

"5. Said trustees shall, and by the acceptance of this trust they do hereby assume to, pay any and all obligations heretofore entered into, and carry out any and all lawful contracts heretofore entered into, by the party of the first part [Margaret F. Welch] acting individually *or through her agent or attorney, Charles G. Welch.* Said trustees shall pay and discharge any and all of said obligations in such manner and at such times as they may deem for the best interests of the trust estate, either out of the corpus of the estate or out of so

much of the net income thereof as shall exceed the sum of $12,000 a year."

The trial court found that "the trustees acted within the authority conferred upon them in purchasing the fifty shares of common stock of the Western Farm Land Company from Miss Alice Shannon, as herein found, and did so with the full knowledge and approval of the term tenants." In our opinion, there is no merit to the contention that the trustees violated any duty in paying an obligation which Mrs. Welch, through her attorney in fact, had acknowledged before the trust was created.

The appellants next contend that the trial court erred in refusing to charge the trustees with the full amount of interest and penalties on taxes which they failed to pay on the real estate at North Seventh street and Wisconsin avenue, which belonged to the Welch Investment Company. It appears that during the years 1931, 1932, 1933, 1934, 1935, 1936, and 1937, the company did not pay its taxes when due, and as a result penalties and interest amounting to $6,553.37 accrued. With respect to this issue, the court found in substance that on account of the financial depression which began in the fall of 1929, the income of the company was not sufficient to pay the taxes on the Seventh street and Wisconsin avenue real estate when due; that the taxes became delinquent; that the delinquencies in taxes have been gradually taken care of out of increased income; that the trustees should protect the corpus of the trust estate and the interest to the remainderman from any past or future impairment of the same, and in any event avoid the issuance of tax deeds or the foreclosure of the mortgage upon the property by reason of any tax delinquency. The court concluded that although the interest and penalties had amounted to $6,553.37, the trustees should be charged with only $4,000, because, by not disposing of a sufficient amount of the trust

estate and advancing it to the corporation so that it might pay its taxes when due, such part of the trust not disposed of had earned at least $2,553.37. In holding the defendant trustees liable for not paying the taxes promptly, the court had in mind the principle of law stated in 3 Bogert, Trusts & Trustees, p. 1928, § 602:

". . . If delay in paying a tax results in the levying of a penalty, the trustee must pay this amount from his pocket, unless conduct of competent *cestuis* had led him into this breach of trust. . . ."

The plaintiffs charge that the amount charged to the trustees was inadequate. The trustees, on the other hand, contend that the amount surcharged was adequate. The trustees do not complain as to the amount charged to them. They have made no motion to review. The only question is as to the adequacy of the amount surcharged. We consider that the findings and conclusions of the trial court fairly determined that issue and should not be disturbed.

It is next contended that the trial court erred in refusing to charge the defendant trustees with the sum of $9,880.04, and interest, a profit received by them on the sale of certain Montana lands known as the Clingen ranch, which were owned by the trust and which profit it is asserted was treated by them as income, rather than corpus, and distributed as such. There is no dispute as to the amount of the profit on the sale of those lands. The defendant trustees contend that they treated that profit as corpus. It is not disputed that such profit was corpus. While the trial court made no specific reference in his findings to that item it did find and conclude that during the period when the Clingen ranch was sold there was no overdistribution of income. The profits sought to be surcharged may have immediately been considered income by the trustees and so distributed, but that was apparently taken care of later on, so that the finding of

the trial court that there was no overdistribution of income during that period, was a permissible finding.

It is next contended that the trial court erred in refusing to charge the defendant trustee, Welch, personally with the sum of $848.73, which it is asserted should have been turned over to the trust instead of being retained by him personally. This contention is based upon the report of Peat, Marwick, Mitchell & Company that one "Elkin owed money to the estate on notes and to the estate and C. G. Welch jointly on a land contract. The parties had agreed that the note indebtedness to the estate should be paid in priority. Elkin made payments and Mr. Welch applied these payments on the joint land contract." There is no dispute as to the amounts collected from Elkin or as to the application of those payments or as to the amount that Charles G. Welch applied to the respective interests in the lands covered by the Elkin contract. The trial court made no specific finding as to this item. It appears, however, that the lands covered by the Elkin contract had been purchased on land contracts from the state of Montana by Charles Welch, Sr., and the defendant trustee Charles G. Welch, Mr. Welch purchasing the north half of the section and Charles purchasing the south half. After the trust was created Elkin purchased the two interests on a land contract. As moneys were paid by Elkin on the contract they were paid over to the state of Montana. Such payments as were made on behalf of the trust estate were entered upon books of the trust as corpus and the amount of such entries were treated as the interest of the trust in the north half of that particular section. The plaintiffs' contention, as hereinbefore stated, is based upon the report of the accountants that the parties had agreed that the note indebtedness to the estate should be paid in priority. It is contended by the defendants that the report of the accountants was based upon the books of the companies examined by them and that there is no evidence in

the record of any such agreement. No evidence, other than the report of the accountants is referred to by the plaintiffs. We therefore find no basis for the contention that Charles G. Welch improperly or in violation of any agreement wrongly apportioned the payments made by Elkin on the land contract in which both the trust and Charles G. Welch were interested.

It is next contended that the trial court erred in refusing to hold the trustees liable for a reasonable amount because of their failure to amortize a certain mortgage given by the Welch Improvement Company to the Northwestern National Insurance Company on the Wisconsin avenue and Seventh street real estate. The Welch Investment Company, on November 27, 1922, obtained a loan from the Northwestern National Insurance Company in the sum of $167,000. It gave a mortgage on the Wisconsin avenue and Seventh street property to secure the loan. The loan was obtained for the purpose of refinancing former loans, a large amount of which was owing to the trust, and to obtain funds for the purpose of further improving the mortgaged property by erecting thereon an additional building. Up to that time the income of the property was insufficient to produce any net income. Up to the time of the trial no part of the principal of the mortgage had been paid. With respect to that issue, the trial court found:

"32. In the year 1915, the Welch Investment Company borrowed the sum of $100,000 from the Northwestern National Insurance Company, and secured the same by giving a mortgage upon its property located at the northwest corner of Seventh street and Wisconsin avenue in the city of Milwaukee. Thereafter, the Welch Investment Company from time to time borrowed additional sums of money, so that the mortgage indebtedness to the Northwestern National Insurance Company in September, 1923, amounted to $167,000. The money borrowed was used in part for the acquisition and improvement of the dock property hereinafter referred to, for improvement of the property of the Welch Invest-

ment Company located at the northwest corner of Seventh street and Wisconsin avenue, and to pay the indebtedness of $80,604 of the company to the trust, which indebtedness existed at the time of the creation of the trust. Said mortgage indebtedness has remained at $167,000 to the present time. Said loans were made, and mortgages given with the full knowledge and consent of the adult beneficiaries."

It is not suggested that the finding of the trial court is not supported by the evidence. The plaintiffs' contention is that the additional building constructed upon the Wisconsin avenue and Seventh street property was in the nature of a temporary improvement and the law applicable to temporary improvements, as stated in Restatement, Trusts, § 233, should be applied. In our opinion, that law has no application to a building such as the one constructed, which has all of the characteristics of a permanent improvement. The rule, which in our opinion is applicable to a situation like this, is stated in Restatement, Trusts, p. 687, § 233 *k:*

"*k. Permanent improvements.* If the improvements are permanent in character, the principal is benefited, the effect being merely to substitute one form of principal for another. It is therefore fair that the cost for improvements should be paid for out of principal without amortization. While the beneficiary entitled to the income may receive a benefit from the improvements in the form of increased rentals, this is balanced by the fact that he no longer receives income from that part of the principal which is expended in making the improvements."

Until the property was improved it was incapable of producing any income and was therefore properly classified as unproductive property. The rule applicable to such property where certain beneficiaries are entitled to the income and other beneficiaries are ultimately entitled to the subsequent income or the remainder or a part thereof, is stated in Restatement, Trusts, p. 689, § 233 *m:*

*"m. Unproductive property.* Ordinary current expenses as well as extraordinary expenses incurred in connection with unproductive property are payable out of principal, unless it is otherwise provided by the terms of the trust. Thus, taxes and other carrying charges on unproductive land are payable out of principal, even though the trust estate includes other property from which an income is derived, unless it is otherwise provided by the terms of the trust. So also, where the trust estate includes a mortgage and the mortgagor defaults, the expenses of foreclosure are payable out of principal; and if the trustee purchases the property for the trust on the foreclosure sale and it produces no income, the carrying charges are payable out of principal until it is sold or becomes productive."

The trial court found that all of the loans mentioned in its finding were made and the mortgages given with the full consent of the adult beneficiaries, among which the plaintiffs are numbered. No objection seems ever to have been made by the plaintiffs, one of whom was a director and both of whom were stockholders in the Welch Investment Company. Both of the plaintiffs shared in the income of the trust which in part and at times resulted from dividends declared by the Welch Investment Company. They therefore should not be heard to complain as to the mortgage at this time.

It is also contended by the plaintiff, in support of this assignment of error, that the doctrine of "wasting property" should be applied and that the trustees should be held liable for a reasonable amount to amortize the mortgage. It is stated in Restatement, Trusts, p. 721, §239, as follows:

"Unless it is otherwise provided by the terms of the trust, if property held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary is wasting property, the trustee is under a duty to the beneficiary who is entitled to the principal, either
"(a) to make provision for amortization, or
"(b) to sell such property. . . ."

In our opinion, the doctrine of "wasting property" is not applicable to the Wisconsin avenue and Seventh street property. See comment to § 239, *supra.*

The property in question is about as permanent as any improved property can be. When the depression broke in 1929, the property was becoming highly profitable. To have disposed of the property when it ceased to be profitable and when all values were shattered, would in our opinion have been most imprudent. We consider that, under all of the circumstances, many of which were beyond the control of the trustees, and especially under the broad powers conferred upon the trustees, the trial court committed no error in refusing to hold the trustees liable for a reasonable amount to amortize some part of the mortgage.

It is next contended that the trial court erred in refusing to require the defendant, Charles G. Welch, to return to the trust estate the salary which was paid to him as president of the Welch Investment Company. This contention is based upon the fact that after the trust was created the trustees held all of the stock of the Welch Investment Company except the four qualifying shares held by Charles, William, James, and Mr. Hengels, and that the trust and the company were so interlocked as to render it improper for Charles to be paid a salary as president of the company in addition to that paid him as trustee.

It will be remembered that Mrs. Welch, the settlor, incorporated the company several years prior to the creation of the trust; that Charles was elected the president thereof; that he was paid a salary as such officer; that the trust was created in 1914; that Mrs. Welch was one of the trustees until she died in 1923; that during all of the years when she was a trustee, the company was regarded as a separate entity, managed by its directors; that during all those years Charles was paid a salary without objection by Mrs. Welch

and with the approval of the directors. The trial court found:

"17. The settlor of the trust was a trustee from the time of the creation of the trust to her death on June 21, 1923. The practice as followed by the trustees in reference to the administration and management of the trust during the period the settlor was a trustee must be given effect to as a practical construction and interpretation of the trust deed by the settlor, and such practices must be taken as establishing the intention of the settlor of the trust as to the manner in which the trust estate should be administered and managed. . . .

"(b) During this period the Welch Investment Company which is not a party to this action, was considered a corporation separate and independent from the trust, and dividends were declared by the Welch Investment Company as a separate and distinct entity from the trust, and therefore, the practice followed during this period and thereafter continued by the trustees must be considered as the practice which the settlor of the trust intended to be followed in connection with the administration and management of the trust estate.

"(c) Prior to the creation of the trust, Charles G. Welch was president of the Welch Investment Company, and received a salary as such president. During the period from October 28, 1914, to the date of the death of Mrs. Welch, he continued to act as president of the Welch Investment Company, and continued to receive his salary as president of that company. Consequently, the intention of the settlor of the trust was that the salary which Charles G. Welch received as president of the Welch Investment Company was not to be considered as part of the compensation stipulated in the trust deed to be paid to the trustees."

The trial court concluded:

"15. The payments of salaries to Charles G. Welch as president of the Welch Investment Company, and as president of the Western Farm Land Company, as herein found, were proper and there is no liability on the part of said Charles G. Welch on account of said payments."

No objection seems to have been made by the plaintiffs as stockholders or as a director (James) to the payment of a salary to Charles, until the action was commenced. They should not now be permitted to raise any question in that regard after the lapse of so many years. Whatever salary was paid to Charles was out of the income, and the owners of the future interests can have no ground for complaint, since they were at all those times not entitled to any part of the income of the trust.

It is next contended that the trial court erred in finding that there was no liability on the part of Charles G. Welch resulting from certain transactions between the trustees and him individually and between the trustees and the Industrial Controller Company, a corporation in which Charles was greatly interested. The extended argument in support of this assignment of error is grounded upon the facts, (1) that the trustees sold to Charles eighty-five shares of the preferred stock of the Industrial Controller Company which came to the trust shortly after its creation in payment of a debt of $8,500 owing to Mrs. Welch at the time she created the trust; (2) that the trustees, in 1920, loaned to the Industrial Controller Company $20,000; (3) that from October 1, 1921, to January 19, 1922, the trustees loaned to Charles the further sum of $6,800; (4) that the trustees loaned to him certain bonds of the par value of $10,000 so that he could use them as collateral in order to obtain money for his own personal use; (5) that the Welch Investment Company sold to the Industrial Controller Company a part of certain property which it had acquired and improved by erecting a building thereon, which sale was promoted by the Welch Investment Company's joining with the Industrial Controller Company in a mortgage to secure bonds aggregating $60,000 in amount. It is asserted that the loans to Charles and to the Industrial Controller Company were made at times when the company was in financial distress, and as a result of such

financial assistance the company survived and ultimately became a very profitable venture for Charles. The principle of law which the plaintiffs invoke is tersely stated in the Restatement, Trusts, p. 564, § 206, and p. 431, § 170 (1) *b*:

"*b. Sale of trust property to the trustee individually.* A trustee with power to sell trust property is under a duty not to sell to himself either by private sale or at auction, whether the property has a market price or not, and whether or not the trustee makes a profit thereby. It is immaterial that the trustee acts in good faith in purchasing trust property for himself, and that he pays a fair consideration."

Those principles are doubtless universally applicable to trustees who are not specifically authorized as individuals to borrow money or to purchase property from the trustees. It will be remembered that the trust deed provided as follows:

"9. The trustees may individually, in good faith, sell any property to the trust estate, purchase any of the trust property from the trust estate or otherwise personally transact business with the trustees and the trust estate."

There can be no doubt that Mrs. Welch, the settlor of the trust, intended to give to the trustees the broadest powers. The trust was created for her own benefit, the benefit of her children, their wives and husband, and her grandchildren. The law applicable to such trusts is stated in the Restatement, Trusts, p. 440, § 170, comment *s:*

"*s. Terms of the trust.* By the terms of the trust the trustee may be permitted to sell trust property to himself individually, or as trustee to purchase property from himself individually, or to lend to himself money held by him in trust, or otherwise to deal with the trust property on his own account. The trustee violates his duty to the beneficiary, however, if he acts in bad faith, no matter how broad may be the provisions of the terms of the trust in conferring power upon him to deal with the trust property on his own account."

In discussing the several bases of the plaintiffs' contention, it must therefore be kept in mind that under a trust like this liability exists only in case bad faith be shown.

The facts surrounding the eighty-five shares of preferred stock of the Industrial Controller Company purchased by Charles may be summarized as follows: Prior to the creation of the trust, Mrs. Welch had loaned $8,500 to the Independent Electric Company, the name of which was later changed to Industrial Controller Company. The loan was evidenced by notes for which preferred stock was later to be issued. Some time after the trust was created, eighty-five shares of preferred stock were issued to the trustees. Mr. Estberg considered that the trustees should not continue to hold that stock. Thereafter, the stock was charged to Charles at par and added to his indebtedness to the estate, secured by his assignment dated December 30, 1916, hereinbefore recited. There is no question that at the time the stock was transferred to Charles it was not worth par; that the purchase price was charged to him and that, upon the distribution of the first one fourth of the trust estate to him and the other adult beneficiaries, the purchase price of that stock, together with interest, was taken into account. In our opinion, there is no basis for a charge of bad faith in connection with the sale and purchase of eighty-five shares of preferred stock in the Industrial Controller Company.

The facts surrounding the loan of $20,000 by the trustees to the Industrial Controller Company may be summarized as follows: In April, 1920, the trustees loaned to the Industrial Controller Company $20,000. This loan was guaranteed by Charles G. Welch, and his contingent liability was secured by his assignment dated December 30, 1916, hereinbefore mentioned. The loan was specifically consented to in writing by Mrs. Hengels and the plaintiffs, James and William. The principal and interest thereon were paid in

full by the Industrial Controller Company. We find no basis for upsetting the conclusion of the trial court that no liability on the part of Charles to the trustees existed as a result of moneys loaned to the Industrial Controller Company.

Nor do we find any basis for liability because the trustees made loans to Charles which were charged to him as an advancement, and the amounts of which, together with interest thereon, were taken into account when the first one fourth of the trust estate was distributed to the beneficiaries entitled thereto. The facts concerning the loan to Charles of bonds of the par value of $10,000 belonging to the estate, so as to permit him to use the same to collaterally secure a loan obtained by him from a bank, are that subsequent to the assignments made by Charles, William, and James on December 30, 1916, moneys and securities of the trust estate were advanced to them, which were charged to them against their interests in the trust estate. Before the bonds were loaned, Mrs. Hengels, and the plaintiffs, James and William, consented in writing that the trustees give to Charles the ten bonds and charge his share with the market value thereof. The bonds had an early maturity and Charles used them as collateral until their due date when they were paid in full. The par value of the bonds, rather than the market value thereof, was charged to Charles and treated as an interest-bearing loan, which was taken into account at the time the first distribution was made. In our opinion, there is no basis for overturning the conclusion of the court that there was no liability on the part of Charles as a result of loans made to him or to the Industrial Controller Company.

The facts concerning the sale of certain real estate by the Welch Investment Company to the Industrial Controller Company, and the signing of the mortgage by the Welch Investment Company may be summarized as follows: In 1912, prior to the creation of the trust, the Welch Investment Company purchased certain property located on the Kinnick-

innic river. The purchase price was $45,000. The property, apparently, was purchased with the intention of erecting buildings thereon to be leased to the Independent Electric Company (the predecessor of the Industrial Controller Company) in which Charles was interested, and to the Milwaukee Yacht & Boat Company, in which James was interested. One of the buildings erected thereon was leased to the Industrial Controller Company. That building and a part of the real estate was subsequently sold to the Industrial Controller Company for $40,000. The deal was consummated by the Industrial Controller Company's borrowing $60,000, on a mortgage in which the Welch Investment Company joined as mortgagor. The mortgage covered other parts of the so-called dock property owned by the Welch Investment Company. The bonds were individually guaranteed by Charles. The mortgage (trust deed) provided that the property belonging to the Welch Investment Company would be released when the mortgage was paid down to a certain amount. The Welch Investment Company was paid $25,000 and given a second mortgage for $15,000 on the property sold. Subsequently, the full purchase price of the property was paid to the Welch Investment Company and no loss resulted from the Welch Investment Company's joining in the mortgage for $60,000. It is not claimed that the sale of a part of the dock company lands was for an inadequate or unfair price or that the sale was not a prudent one under all of the circumstances. The transaction resulted in no loss to the Welch Investment Company except that the court found that Charles G. Welch improperly retained, as a commission and for services rendered, in connection with that deal, the sum of $1,298.46, for which the court required him to account.

We are of the opinion that under all of the circumstances the contention that Charles should be made to account in-

dividually for an equitable proportion of the profits which came to him in later years after the Industrial Controller Company had become highly profitable, is without merit.

It is next contended that the trial court erred in holding that the plaintiffs were estopped to question any of the acts or omissions of the trustees except the retention by Charles of a commission on the sale of the real estate of the Welch Investment Company to the Industrial Controller Company. The conclusion of the trial court was based upon the several consents and authorizations to the trustees to act in certain situations and also upon the fact that annual audit reports were sent or delivered to them up to December 1, 1929, to which they had never offered any objections prior to the commencement of the action. We deem it unnecessary to discuss this asserted error for the reason that the findings and conclusions of the trial court regarding the transactions between the trustees and the Industrial Controller Company are held to be sound regardless of any estoppel.

The plaintiffs further contend that the trial court erred in deciding that the trust estate was indebted to the trustees for unpaid compensation during the period commencing April 1, 1934, and ending December 31, 1937. It is argued that because the trustees mismanaged the estate it should be held that they are not entitled to any unpaid compensation even though the trust deed specified the amount thereof. Since the trial court found that there had been no breach of trust or mismanagement by the trustees no sound reason is perceived why, during the period in question, compensation should be denied them.

The plaintiffs next contend that the trial court erred in holding that Charles G. Welch is entitled to receive the second distribution of the corpus. The court concluded as follows:

"17. Charles G. Welch is entitled to receive the second distribution of the corpus of the trust estate to which he is

entitled under the trust deed. The value of such share when distributed must be based on the value of the trust estate at the time of such distribution."

It will be recalled that the trust deed provided for a one-fourth division of the residue of the estate remaining in the hands of the trustees when Charles, William, and James should arrive at the age of forty years, upon condition "that each respectively shall, in the judgment of said trustees (they to be the sole judges and their exercise of judgment in this respect to be final and unappealable) then be worthy and of suitable, careful and reliable habits and disposition and sufficiently versed in matters of business to have and receive the same." It is argued that since there are now three trustees, the trial court had no power or authority to hold that Charles was entitled to receive the second distribution of the corpus of the trust. The second one fourth has not as yet been distributed. It appears from the testimony that both of the defendant trustees, at the time of the trial, were of the opinion that neither William nor James had shown himself entitled to a second division of the corpus. If conclusion 17 be regarded as an attempt by the court to exercise a discretion or judgment which only the trustees may exercise, then it would be erroneous and subject to criticism, but in view of all the other findings and conclusions, we take it to mean that no act of Charles, in the administration of the trust, precludes him from being entitled to a second distribution of the corpus when and if the trustees shall decide that he is entitled thereto.

It is next contended that the trial court erred in finding that the net income of the trust for the period from June 22, 1923, to October 31, 1933, according to the books of the trustees, was $406,101.78, and in particular, that $107,316.50 of this income was represented by dividends on the earnings of the Welch Investment Company. This assignment is grounded upon an asserted mistake of $10,000 in computing

the dividends declared by the Welch Investment Company during the period covered by the finding and upon the assertion that the dividends declared by the Welch Investment Company were out of surplus created in considerable part by writing up or appreciating the book value of the company's real estate. As to the asserted mistake of the trial court, it appears that the court in computing the total sum of dividends paid by the company to the trustees during the period from June 22, 1923, to October 31, 1933, at $107,316.50, erroneously included dividends so paid during the year 1921 amounting to $4,990.75 and dividends paid during the year 1922 amounting to $4,990.75, totaling $9,981.50. Assuming that the dividends were properly paid to the trustees, it appears that the sums so paid during that period amounted to only $97,335.

As to the assertion that the dividends so declared were in large part paid by the company out of surplus created by writing up or appreciating the book value of the real estate, it appears that in 1918 the company appreciated the book value of its real estate $21,000, in 1922, $22,500, and in 1930, $111,500. Up to the year 1918 the company operated at a loss. During subsequent years it sometimes operated at a profit and sometimes at a loss, especially commencing in 1931. It is asserted that the accountants' analyses of surplus, taking the whole period into consideration, revealed that there was an operating loss of $53,958.15, and that during the whole period dividends amounting to $131,352 were declared and paid to the trust.

It is well established in this state that where trustees hold corporate stock in which one is beneficially entitled to the income for his life and another is entitled to the remainder, the trustees may credit to income, and distribute as such, only dividends which are declared from corporate earnings subsequent to the creation of the trust, and that all dividends paid from surplus resulting from an appreciation of assets belong

to the remainderman and must be credited to corpus. *Soehn-lein v. Soehnlein,* 146 Wis. 330, 131 N. W. 739; *Miller v. Payne,* 150 Wis. 354, 136 N. W. 811; *Estate of Gerlach,* 177 Wis. 251, 188 N. W. 94; *Estate of Matthews,* 210 Wis. 109, 245 N. W. 122. While the trial court found and concluded that the Welch Investment Company was properly considered a corporation separate and independent from the trust, and that dividends were declared by it as a separate and distinct entity from the trust, we think that that conclusion was without materiality in determining the respective rights of the life tenants and remaindermen to dividends declared. The defendant trustees contend that it is proper and legal for corporations to declare dividends out of surplus if the assets of the corporation are valued honestly and fairly in view of the facts known at the time and a surplus exists based upon such honest valuation. The principle of law invoked is doubtless sound and in accord with the rule fixed by sec. 182.19 (2), Stats.:

"(2) But any corporation which has invested net earnings or income in permanent additions to its property, *or whose property shall have increased in value,* may declare a dividend either in money or in stock to the extent of the net earnings or income so invested *or of the said increase in the value of its property;* but the total amount of such dividend shall not exceed the actual cash value of the assets owned by the corporation in excess of its total liabilities, including its capital stock."

That law, applicable to the declaration of dividends by corporations, is not controlling as to the respective rights of life tenants and remaindermen to the declared dividends. Dividends declared out of surplus resulting from an increase in value or appreciation of assets are not income. *Miller v. Payne* and *Estate of Matthews, supra.* We therefore conclude that so much of the dividends as were declared by the Welch Investment Company out of surplus resulting from

an increase in value or book appreciation of its real estate was improperly distributed by the trustees as income; that so much of the dividends as were based upon appreciated assets should have been credited to corpus, and that since all of such dividends were distributed to those entitled to the income, an overdistribution of income resulted.

It is quite impossible for us, without the aid of accountants, to determine the amount of the overdistribution of income based upon dividends declared by the Welch Investment Company out of surplus created by appreciated value of its real estate. The trial court, with the aid of counsel and the accountants who audited the books of the trust and those of the Welch Investment Company, should have no great difficulty in ascertaining the correct amount of the dividends received by the trust which should have been credited to corpus.

When that amount is determined, upon a remand of the cause, a question will arise as to whether the amount of the overdistributed income should be made good by the trustees or whether such overdistribution may equitably be taken care of in another way. The overdistributed income was received by Charles, William, James, and Mrs. Hengels. True Mrs. Welch, the settlor, doubtless shared to a very slight extent in the dividends declared in 1921 and 1922. She was entitled to the total income of the trust, unless the trustees should deem it for the best interests of the trust estate to pay the obligations of the trust out of the net income over and above the sum of $12,000 a year. See Paragraphs 5 and 12 of the trust deed. The trustees paid all of the net income to Mrs. Welch during her lifetime or pursuant to her specific written instructions. Under those instructions Charles, William, James, and Mrs. Hengels received large parts of the income. So, in our view, we may ignore any slight overdistribution of income to Mrs. Welch.

The dividends declared by the Welch Investment Company after her death were distributed as income to Charles, William, James, and Mrs. Hengels. Upon the death of Mrs. Welch, Charles, William, and James each became entitled to a one-twelfth share of the trust estate, if at that time each had attained to the age of thirty years, and to another one-twelfth share of the trust estate five years thereafter, provided each had arrived at the age of forty years and "provided that each respectively shall, in the judgment of said trustees (they to be the sole judges and their exercise of judgment in this respect to be final and unappealable) then be worthy and of suitable, careful and reliable habits and disposition and sufficiently versed in matters of business to have and receive the same." The first distribution of corpus has been made. The second distribution of corpus has not been made. In our opinion, it will be fair, just, and equitable, when the amount of such overdistribution of income has been determined, which amount is held to have been a distribution of corpus, to subtract therefrom a one-fourth part, which part might properly have been distributed to Charles, William, and James as corpus, at the time of the first distribution of corpus, and to restore to corpus the remainder thereof in the following manner: Charge four twenty-fourths of the total amount of such overdistribution to Charles, four twenty-fourths thereof to William, and four twenty-fourths thereof to James, as advancements or partial distributions of their respective shares of the corpus under the distribution of the second one fourth thereof. Mrs. Hengels received a one-fourth share (six twenty-fourths) of the overdistributed income. This likewise must be restored to corpus. But the overdistribution of income to her may not be adjusted by charging it to corpus because under the trust she will never be entitled to a distribution of any part of the corpus. The six twenty-fourths of the overdistributed income which she received should be charged against her future income account, and no further income paid to

her until the amount of the overdistributed income received by her, plus interest on so much of such overdistributed income as equals a two twenty-fourths part thereof has been wiped out by future income of the trust to which she otherwise would be entitled. In the event of her death before the income to which she is entitled equals the amount of corpus which she improperly received as income, the trustees must make good any deficit necessary to restore to corpus the full amount improperly received by her, unless such possible deficit be recovered from her estate. The corpus of the estate in which the children of Charles, William, and James have vested interests (paragraph 14 c), the corpus of the estate in which Mrs. Hengels' child or children, if any, her surviving husband, if any, have contingent interests (paragraph 15), and the corpus of the estate in which the children of Charles, William, and James have contingent interests (paragraph 15, A, B.), will then and thereby be restored.

The plaintiffs next contend that the trial court erred in finding that the net income of the trust from October 28, 1914, to June 21, 1923, the day before the death of Mrs. Welch, was $234,831.17. In so finding, the trial court accepted the amount of the net income as determined by the audit of Peat, Marwick, Mitchell & Company, i. e., $217,376.84. With that figure as a starting point, the court added thereto, (1) dividends received from the Welch Investment Company in the amount of $7,183.61; (2) interest accrued on notes receivable as of October 28, 1914 (the date of the creation of the trust), in the amount of $3,581.79, and (3) interest accrued on bonds as of October 28, 1914, in the amount of $6,683.93, which interest, (2) and (3), was treated in the audit as principal or corpus, not income. Ordinarily, when a trust is created which consists in part of interest-bearing securities, proper accounting, in the absence of a permissible finding of a contrary intent by the settlor, would require that items of accrued interest should be con-

sidered as principal. The trial court, however, doubtless concluded, after construing the trust deed in the light of the surrounding circumstances, that it was the intention of Mrs. Welch that the trustees should treat the interest, when actually received by them, as income. To have treated the accrued interest as of the date of the trust as principal would result in her losing the benefit of all of the interest on the securities that had accrued prior to the creation of the trust. The trust deed provided:

"12. Said trustees shall, from time to time and at such times as may be convenient, pay over to said Margaret F. Welch *all of the net income derived from said trust estate* during the term of her natural life, except as provided in paragraph five (5) hereof."

Under the circumstances, we are of the opinion that it was permissible for the trial court to treat the interest, when actually received by the trustees, as income. The amount of net income distributed during the period in question was $218,502.38. Adding the amounts of the court's adjustments to the net income of $217,376.84, as found by the auditors, shows that there was no overdistribution of income during the period in question. The item of dividends received from the Welch Investment Company and paid out of earnings in the amount of $7,183.61, which the court added to the net income as found by the auditors, will abide the determination of the trial court, regarding the amount of the dividends paid by the Welch Investment Company, prior to 1923, which should have been credited to corpus in accordance with the law stated in discussing the last previous assignment of error.

It is next contended that the trial court erred in concluding that "under the terms of the trust deed the trust estate was not to be segregated into shares until the death of any one of Charles G. Welch, William O. Welch or James B. Welch, as

provided in subparagraph c of paragraph 14 of the trust deed." This contention is based upon the report of Peat, Marwick, Mitchell & Company, which stated in substance that when Mrs. Welch died on January 22, 1923, the books should have been closed and an accounting made by the trustees to determine the trust principal at that time, pursuant to paragraph 13 of the trust deed, (1) because a distribution of principal was required at that time, and (2) because the income subsequent to that time became subject to distribution under paragraphs 14 and 15 of the trust deed. The accountants raised the question whether a segregation of the trust principal into four separate trusts should not have been made as of June 22, 1923, by dividing into four parts the cash and other assets having a ready market and the remaining assets, and suggested that because that was not done the remaining interests appeared to have suffered. It will be recalled that the first distribution of corpus to Charles, William, and James and the value of each of said interests was not, as a matter of fact, fully computed and determined until the year 1930, and that the advancements made to them, which had been consistently treated by the trustees as interest-bearing loans, secured by the assignments of December 20, 1916, at that time substantially equalled, the shares of Charles and James and somewhat exceeded the share of William, such excess being charged against his interest in the second distribution of corpus. It will also be recalled that many of these advancements or loans were made to the three sons during the lifetime of Mrs. Welch, the settlor, and while she was one of the trustees. While it might have been proper, and in accord with principles of good accounting, to segregate the several trust estates immediately following the death of Mrs. Welch, it does not follow that the trustees were required to do so under the trust deed. The trust deed made no mention of segregating the principal of the trust into shares until the

respective deaths of Charles, William, and James. In paragraph 14 c the word "segregate" first occurs in the trust deed in the following language:

"Upon the respective deaths of said three persons named in subparagraph 'A' hereof, said trustees shall *segregate* and set aside an even and equal one third ($\frac{1}{3}$) of the remaining one third ($\frac{1}{3}$) of said trust property and estate, being one twelfth ($\frac{1}{12}$) of said entire residue in each case, and as to such part or portion said trust shall thereupon continue until," etc.

It is significant that the settlor directed no segregation prior to the time of the death of either Charles, William, or James. It is also significant that throughout the years prior to 1923 advancements treated as loans were made to Charles, William, and James out of the principal of the trust. All of this was done in pursuance of the intention of Mrs. Welch as expressed in the trust deed and in the agreement to which she was a party as settlor and also as trustee, dated December 30, 1916. While the remaining interests may presently appear to have suffered as a result of the depressed values which have so universally resulted from the depression, that fact does not require us to hold that the conclusion of the trial court was erroneous. We find no language in the trust deed or the agreement modifying it tending to show that the settlor intended that the trust should be segregated prior to the death of either Charles, William, or James, or that it should not be managed and administered as a single trust up to that time.

The next contention is that the trial court erred in refusing to award the plaintiffs their costs and disbursements. This contention is grounded upon the assertion that the plaintiffs acted in good faith and that the court abused its discretion in not awarding them their costs and disbursements. The action for an accounting is, of course, an equitable action and in such actions costs may or may not be al-

lowed to a party, in the discretion of the court. Sec. 271.02 (2), Stats. We find nothing in the record which impels the conclusion that the court abused its discretion.

The plaintiffs finally contend that the trial court erred in failing to remove the trustees as requested. This contention is based upon the facts that Mr. Estberg is past seventy years of age, and that Charles G. Welch removed his residence to the state of Michigan on or about January 1, 1937. Under sec. 231.26, Stats., the circuit court may remove any trustee who shall have violated his trust or who, for any other cause, shall be deemed an unsuitable person to execute the trust. In Restatement, Trusts, p. 279, § 107, comment *a*, the applicable rule is thus stated:

"*a. Removal by court.* A court may remove a trustee if his continuing to act as trustee would be detrimental to the interests of the beneficiary. The matter is one for the exercise of a reasonable discretion by the court."

As to the removal of a trustee on the ground of nonresidence, or absence from the jurisdiction, it is generally held to lie in the discretion of the court "which will ordinarily not regard the bare fact of absence or nonresidence as ground for removal, but will remove an absent trustee where his absence endangers the trust estate, as where the absence is of a prolonged or permanent character precluding proper attention to the trust, or where, in addition to absence, there is also neglect of duty." 65 C. J. p. 618, § 449.

Both of the defendant trustees were at the trial and testified at length. The trial court had every opportunity to judge of their fitness to continue as trustees. Certainly both of them are familiar with the properties belonging to the trust, and with the perplexing problems which have arisen in the administration of the trust. In our opinion, it cannot be said that the trial court did not exercise a reasonable discretion or that it abused its discretion in continuing the defendants as trustees.

APPEAL FROM ORDER.

At the conclusion of the trial, the questions as to the amount of the compensation to be paid Peat, Marwick, Mitchell & Company, and from what source, were held open for future determination upon application to the court. Thereafter, a hearing was duly held and at the conclusion thereof the court ordered that the trustees pay to Peat, Marwick, Mitchell & Company, either out of the corpus or income of the trust estate, the sum of $1,600 for services rendered by them as accountants in connection with the action. From that order Peat, Marwick, Mitchell & Company appealed.

It is contended that the trial court erred in allowing said appellants the sum of only $1,600, because that amount is much less than the reasonable value of the services rendered.

On or about June 5, 1936, William O. Welch, individually and in behalf of some of the interpleaded defendants, and Hubert O. Wolfe, guardian *ad litem,* petitioned the court and represented that in order properly to prepare for trial it would be necessary to have a complete report showing all receipts and disbursements by the trustees, the value of the marketable securities at the date of the death of Margaret Welch, how the funds of the trust estate were invested and handled by the trustees, upon what basis the first quarter of the estate was distributed, and generally a complete examination of how the trust was handled by the trustees from the date it was created up to that time. It was represented that the petitioners had arranged with the firm of Peat, Marwick, Mitchell & Company to make an examination and analysis of all matters and to make a complete written report thereof. The petition was accompanied by a letter, addressed to the plaintiff's attorney, by Peat, Marwick, Mitchell & Company, in which the suggested work was outlined. That letter concluded as follows:

"You have asked us to estimate the cost of such an examination. You will appreciate, we are sure, that it is impossible to make a fair estimate of the time which would be required, but it will be satisfactory to us if at the conclusion of our work we furnish the court with a detailed statement of the time expended, and we will accept as our remuneration such fee as the court may allow."

An order was issued requiring the trustees, Mrs. Hengels, and the interpleaded defendants who had not joined in the petition, to show cause why the prayer of the petition should not be granted. The matter was heard by the Hon. DANIEL W. SULLIVAN, circuit judge. Thereafter, it was duly ordered that an audit be made. The order, however, provided:

"When the amount claimed by said Peat, Marwick, Mitchell & Company for their services exceeds the sum of one thousand dollars ($1,000), then, and in that event, said auditors shall apply to this court for an order approving such charge for the services rendered and for further instructions. As to whether the expenses of such audit shall be charged to the beneficiaries or to certain of the beneficiaries or charged to the trust estate, is to be finally determined at the time of the trial of the action on its merits."

Thereafter, Peat, Marwick, Mitchell & Company performed services in preparing an audit, but when their compensation for services rendered exceeded $1,000, they did not apply to the court for an order approving their charges for services up to that amount, nor did they apply for further instructions. The trial court, after due hearing, however, allowed $600 additional compensation for reports and audits prepared during the trial. Upon the hearing had to determine their compensation, Peat, Marwick, Mitchell & Company presented itemized bills covering services rendered by them, the reasonable value of which they claimed was $8,110. The trial court obviously felt that the reports and audits made in support of certain theories as to the manner in which the trust should have been administered, were unnec-

essary because the theories underlying them were not sound. A large amount of work was done for the purpose of supporting the theories advanced. In the order the trial court stated, after allowing the $1,600, that "the trust estate is not liable for the balance of the fees of Peat, Marwick, Mitchell & Company and the correctness of the amount of the balance of its charges is not determined." Under all of the circumstances, we cannot say that the trial court allowed an inadequate amount for those services properly rendered in connection with the action. Clearly, Peat, Marwick, Mitchell & Company should have applied to the court for further instructions and an order when the value of the services rendered exceeded the sum of $1,000. Under all of the circumstances, we cannot say that the trial court erred in limiting the compensation to be paid by the trustees out of the corpus or income of the estate to $1,600.

*By the Court.*—Judgment affirmed in part; reversed in part. Cause remanded with directions to determine the amount of dividends declared by the Welch Investment Company out of surplus created by appreciating the value of its real estate and to modify the judgment in accordance with the opinion. Taxable costs in this court to be allowed the appellants. Order affirmed.

The following opinion was filed June 24, 1940:

NELSON, J. (*on motion for rehearing*). William O. Welch, James B. Welch, Annette L. Welch, wife of William O. Welch, Nancy Atwater Welch, and Margaret Ann Welch, adult daughters of William O. Welch, Annette Welch, wife of James B. Welch, and Hubert O. Wolfe, guardian *ad litem* for the minor heirs, Mary Lucy Welch, Ann Whitney Welch, Fredericka Welch, and James Welch, Jr., move for a rehearing on several grounds. It is first contended that the court, in disposing of their twentieth assignment of error

overlooked or misunderstood their principal contention. In their original brief they asserted:

"The court erred in finding that the net income of the trust from October 28, 1914, to June 21, 1923, was $234,831.17."

The trial court found:

"The net income of the trust from October 28, 1914, to June 21, 1923, as determined in Exhibit 7, page 16, is $217,376.84, to which should be added dividends received from the Welch Investment Company and paid out of earnings, in the amount of $7,188.61, interest accrued on notes receivable as of October 28, 1914, $3,581.79, and interest accrued on bonds as of October 28, 1914, $6,683.93, so that the total net income of the trust for the period from October 28, 1914, to June 21, 1923, was $234,831.17. The distribution of income . . . was $218,502.38. So that there was no overdistribution of net income of the trust for the period from October 28, 1914, to June 21, 1923."

In considering that finding we assumed that the figure $217,376.84 represented the true net income for that period as found by the auditors. That amount, plus the adjustments which the trial court added to it, exceeded the income distributed during that period. It is contended that the court overlooked plaintiffs' contention that there was included in the $217,376.84, the sum of $46,023.98, accrued interest on advances and loans made to the beneficiaries, Charles, James, and William, which had not been collected. The interest actually accrued at that time and due from Charles, William, and James on loans or advancements was $37,995.28. The loans and advancements were made by the trustees under the broad powers conferred upon them by the trust deed, or under the assignments made by Charles, William, and James on December 30, 1916. It is contended that since the interest due the trustees had not been actually received by

them, it should not have been treated as income and should not have been distributed as such. Since Charles, James, and William in all probability would be entitled to payments of corpus, the trustees doubtless figured that the interest owed by the beneficiaries would be adjusted at the time of the distribution to them of the first one fourth of corpus. Assuming, for the purposes of argument, that there was a technical overdistribution of income during the period mentioned because the interest had not been collected, and that there was an overdistribution of income which temporarily came out of corpus, that appears to have been corrected in the process of distributing to Charles, James, and William the first one fourth of the corpus and in charging the remainder due against their interests in the remaining corpus, by which their debts to the trustees were either wholly or partially liquidated. Any improper distribution of income out of corpus was in that manner restored to corpus. The remaindermen therefore have no cause for complaint because of any temporary overdistribution of income during that period. William and James may not complain since they had assigned the whole of their respective interests in the trust to the trustees as collateral security for the payment of their then existing indebtedness or any other indebtedness or liability to the said trustees that might thereafter be contracted by them. (Assignments dated December 30, 1916.) The court specifically found that there was no overdistribution of income or of corpus during the administration of the trust. Looking at the whole administration of the trust from 1914 to the date of the trial, we cannot say that the court's finding, that there was no overdistribution of income or corpus (other than the Welch Investment Company dividends, as found by this court), was against the great weight and clear preponderance of the evidence.

It is next contended that this court should have determined the exact amount of the dividends declared by the Welch Investment Company, which was paid to the trustees and improperly distributed by them as income. We considered that it was quite impossible for us, without the assistance of accountants, to determine the correct amount of the overdistribution of income based upon dividends declared by the Welch Investment Company out of surplus created by appreciating the value of its real estate. We have reconsidered this matter for the purpose of determining whether we might possibly reach a correct result without the assistance of accountants. When it is considered that the appellants contend that the dividends improperly distributed as income amount to $109,765.44, and that the respondents contend that the dividends improperly distributed amount at the very most to $23,000, the difficulties which confront us are apparent. We therefore adhere to our former ruling that the cause should be remanded with directions to the trial court to determine the amount of dividends declared by the Welch Investment Company out of surplus created by appreciating the value of its real estate, which dividends were received by the trustees and improperly distributed as income.

It is next contended that the court should have ordered the trustees to restore to the trust the full amount of the dividends received by them, which were declared by the Welch Investment Company by appreciating the value of its real estate. This court deemed it just and proper that the amounts of any overpayments received by Charles, James, and William should be charged against their respective interests in the corpus of the estate, and that the amount of the overpayments to Mrs. Hengels should be adjusted by withholding from her all income until the trustees were repaid the amount of the overpayments, but in the event

of her death prior to such repayment and upon failure of her estate to repay the balance due, that the trustees should make good any loss. We adhere to the ruling with respect to any overpayments to Charles, James, and William, but upon careful reconsideration, we are of the view that the trustees should be required presently to restore to the trust estate the six twenty-fourths part of the dividends which was improperly distributed to Mrs. Hengels, and that the trustees so paying shall have a lien or liens upon her future income, payable out of the trust, until they have been reimbursed. We reach this conclusion because Mr. Estberg, one of the trustees, is presently of the advanced age of seventy-eight years, and because the burden of such reimbursement should be placed upon the trustees, and not left to the uncertainties of collection which may exist in the future. In 1 Restatement, Trusts, p. 783, § 254, it is stated:

> "If the trustee has made a payment out of trust property to one of several beneficiaries to which the beneficiary was not entitled, such beneficiary is personally liable for the amount of such overpayment, and his beneficial interest is subject to a charge for the repayment thereof, unless he had so changed his position that it is inequitable to compel him to make repayment."

Mrs. Hengels did not appear in the action although originally made a party. So far as she is concerned, there is nothing to show that it will be inequitable to compel her to make repayment of so much of the corpus as she improperly received as income. If she repays to the trustees the amount improperly received by her, as counsel for the respondents suggests she probably will, that will end the matter so far as she is concerned. Charging Charles, James, and William with the overpayment against their interests in the corpus is, in our opinion, not unjust or inequitable since each of them had assigned his interest in the trust to the trustees to secure his indebtedness.

It is suggested that in the event this court should decide to determine the amount of overdistribution of income based on the dividends received by the trustees from the Welch Investment Company, that we determine the reasonable amount of additional attorneys' fees which should be allowed the plaintiffs' attorneys. It is asserted that the small amount of attorneys' fees allowed them by the trial court out of the trust was based upon the comparatively small amount which the court required the trustees to make good to the trust estate, and that since further restorations to the trust estate will doubtless follow the determination of the amount of the overdistribution of income based on the dividends mentioned, their fees should be increased. Since the matter of the overdistribution must be determined by the trial court, we think the matter of additional attorneys' fees should also be determined by it. In our opinion, the trial court, in its discretion, may properly allow additional fees to the plaintiffs' attorneys and to the guardian *ad litem* based upon the additional recovery, and may order the payment of a reasonable amount to the accountants for additional services to be rendered in assisting the trial court in determining the correct amount of the dividends improperly distributed as income.

*By the Court.*—The motion for rehearing is denied. The mandate is modified to read: Judgment affirmed in part, reversed in part. Cause remanded with directions to determine the amount of dividends declared by the Welch Investment Company out of surplus created by appreciating the value of its real estate, and to modify the judgment in accordance with the opinion and this memorandum on motion for rehearing. Taxable costs in this court, including $25 motion costs, to be allowed the appellants. Order affirmed.